261 F.3d 877 (9th Cir. 2001)
 RODGER M. CRIPE; BRAD J. MARTIN; JAMES P. O'KEEFE; THOMAS F. PALMER; VINCE FEARHEILEY; BRIAN J. ARVIN, PLAINTIFFS-APPELLANTS,
v.
CITY OF SAN JOSE; SAN JOSE POLICE OFFICERS ASSOCIATION, DEFENDANTS-APPELLEES. BRIAN J. ARVIN; MERCEDES HELEN PHILLIPS, PLAINTIFFS-APPELLANTS,
v.
CITY OF SAN JOSE; SAN JOSE POLICE OFFICERS ASSOCIATION, DEFENDANTS-APPELLEES.
 No. 99-15253,, No. 00-15625
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted April 10, 2001
Filed August 17, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 Counsel Frank A. Jelinch, Cupertino, California, for plaintiffs-appellants Roger M. Cripe, James P. O'Keefe, Thomas F. Palmer, and Vince Fearheiley.
 Daniel Jensen, Milpitas, California, for plaintiffs-appellants Brian J. Arvin and Mercedes Phillips.
 Clifford S. Greenberg, Senior Deputy City Attorney, San Jose, California, for defendant-appellee City of San Jose.
 Appeal from the United States District Court for the Northern District of California William A. Ingram, District Judge D.C. No. CV-96-20060-WAI/PVT; D.C. No. CV-96-20494-WAI
 Before: Stephen Reinhardt, A. Wallace Tashima, and Marsha S. Berzon, Circuit Judges.
 
 Reinhardt, Circuit Judge
 
 1
 The plaintiffs in this consolidated action, San Jose police officers with neck and back injuries that prevent them from serving as patrol officers, contend that the City of San Jose's policy that categorically restricts the jobs that officers with disabilities can perform to a small number of undesirable positions violates the Americans with Disabilities Act (ADA). The City, reciting the importance of the work performed by police officers, disagrees. It contends that public safety would be compromised if officers with physical limitations that prevent them from forcibly arresting suspects were permitted to perform more than the prescribed handful of jobs on its police force. Given the standards of review that apply to this appeal, we must agree with the plaintiffs that the City's policy relegating them to unsatisfactory jobs in which they have little or no possibility for promotion simply cannot be reconciled with the ADA's "clear and comprehensive national mandate" to "eliminat[e] . . . discrimination against individuals with disabilities." 42 U.S.C. §§ 12101(b)(1).
 
 
 2
 The ADA does not contemplate that the disabled must be integrated only into workplaces in which the work to be performed is unimportant -it requires every type of employer find ways to bring the disabled into its ranks, even when doing so imposes some costs and burdens. When enacting the ADA, Congress concluded that such is a small price to pay for the benefits of living in a society in which the disabled may realize "equality of opportunity, full participation, independent living, and economic self-sufficiency." Id. at §§ 12101(a)(8). The City of San Jose's police department must participate in this process, as long as it can do so in a manner that will not compromise public safety. The ultimate question in this case is whether its current policies and practices conform with the ADA's mandate.
 
 I. BACKGROUND[1]
 
 3
 The San Jose Police Department employs approximately one thousand police officers and an additional three hundred sworn officials holding higher ranks, including Sergeant, Lieutenant, Captain, and Chief. Slightly over a majority of police officers work in beat-patrol assignments, while almost half work in other "specialized assignments." Because the specialized assignments are highly desirable, the Department and the officers' union, the San Jose Peace Officers' Association ("police union"), have negotiated elaborate procedures, known as the "Officer Transfer Policy," for awarding these preferred jobs.[2]
 
 
 4
 Under the Officer Transfer Policy, officers may hold specialized assignments for only a limited period, generally three years, after which they must return to patrol duties. Furthermore, in the year immediately prior to receiving a specialized assignment, the officer must have worked as a beat-patrol officer. In other words, specialized assignments are available only to those officers who have served as beat-patrol officers for the preceding year, and officers receiving such assignments must generally return to beat-patrol duties after three years.
 
 
 5
 The plaintiffs in this action are six San Jose police officers who have suffered neck, back, and other injuries while on the force.[3] These injuries prevent them from serving as beat-patrol officers, but are not so debilitating as to prevent them from performing any police-officer positions on its force. The plaintiffs contend, however, that the City has improperly limited the type of non-patrol assignments that they are permitted to receive.
 
 
 6
 For the last quarter century, the City has struggled to develop an acceptable plan for reassigning patrol officers who become disabled. The record discloses that the Department's bureau chiefs had concerns about any policy that permitted too many disabled officers to be assigned to their command. The current policy, called the "Modified Duty Policy," is the result of a negotiated agreement between the City and the police union. Under that policy, officers "not fit for regular assignment" are assigned to a "Modified Duty Pool." The City and the police union negotiated a list of positions, known as "modified-duty assignments," that can be performed by officers in the Modified Duty Pool. Modified-duty assignments are allocated among disabled officers primarily on the basis of seniority. All of the positions are non-patrol positions, but unlike the specialized assignments (the non-patrol positions filled by the non-disabled officers), the modified-duty assignments are considered to be highly undesirable. After the modified-duty-assignment policy was initially adopted, the Department management sought, in subsequent contract negotiations, at the insistence of the deputy chiefs and other command staff, to reduce the number of modified-duty positions. Ultimately, under the contract in effect when the present litigation commenced, a total of thirty specified modified-duty positions were set aside for disabled officers.
 
 
 7
 The plaintiffs allege that the modified-duty positions are jobs in which disabled officers are given no real work and in which they are forced to labor under degrading conditions. Officer Arvin explained in a letter to a Department official that in his modified-duty position, he and other disabled officers were forced to work in office space that also functioned as a supply room, and that able-bodied officers constantly interfered with the efforts of the disabled officers to do their jobs by pushing them out of the way while getting supplies. The able-bodied aggressors would refer to those officers on modified-duty status as "lame," "lazy,""faker," "sniveler," "whiner," and "pussy." Furthermore, the officers on modified-duty status were forced to work disadvantageous shifts, and given the least desirable days off.
 
 
 8
 The Modified Duty Policy does not permit the City to make any individual assessment as to whether an officer, with or without an accommodation, can perform the essential functions of any job other than the contractually set-aside "modified-duty" positions. Thus, no disabled officer is eligible for any other job assignment within the Department.
 
 
 9
 Further, under the Officer Transfer Policy, officers who are not serving in patrol positions are not eligible to bid for "specialized assignments." Because the plaintiffs cannot perform patrol duties, the transfer policy categorically precludes them from receiving any of the positions they seek to obtain by means of the present action.
 
 
 10
 The plaintiffs also allege that the City's policies and practices prevent them from being promoted to sergeant positions. They note that the City requires all new sergeants to spend eighteen months in the Bureau of Field Operations, the Bureau responsible for beat patrols and which is composed primarily of beat-patrol officers. The Chief of Police, who must approve all promotions, has a practice of requiring all newly promoted sergeants to work in the "district assignments" unit of the Bureau, which is the unit responsible for patrol, for the first twelve of these eighteen months. Because the plaintiffs' disabilities prevent them from serving as patrol officers, they cannot fulfill this requirement either.
 
 
 11
 The plaintiffs cite to the deposition of a former Chief of Police who testified that if a disabled officer could not perform this twelve-month patrol assignment, then the officer could not be promoted. None of the plaintiffs, of course, has the ability to serve in a patrol capacity. Finally, Officer Arvin explains in his declaration that he was told by the"Assistant Chief [that he] couldn't promote to Sergeant, because [he] couldn't work the streets."
 
 
 12
 Dissatisfied with the inadequacies of their modified-duty assignments and the lack of opportunity for promotion, two separate sets of plaintiffs filed actions against the City and the police union.[4] In the first, four plaintiffs, Officers Cripe, O'Keefe, Palmer and Fearheiley ("Cripe plaintiffs") seek monetary and declaratory relief pursuant to the ADA. The Cripe plaintiffs allege that they are all disabled and were placed into modified-duty status because of their disabilities. They claim that because of this status, they are denied employment and promotional opportunities in violation of the ADA.
 
 
 13
 In the second action, two plaintiffs, Brian Arvin and Mercedes Phillips ("Arvin plaintiffs") brought an action seeking monetary damages, and declaratory and injunctive relief under the ADA and under the California Fair Employment and Housing Act. Like the Cripe plaintiffs, the Arvin plaintiffs allege that as a result of being assigned to modified-duty positions exclusively, they are denied employment and promotional opportunities available to able-bodied officers.
 
 
 14
 Both sets of plaintiffs contend that they wish to perform, and are able to perform, the "essential functions " of various specialized assignments and are otherwise entitled to relief under the ADA. Because the City's policies prevent them from competing for specialized assignments, the plaintiffs argue that these policies violate the ADA's prohibition on discrimination against qualified individuals with disabilities. The City argues that the policies that prevent the plaintiffs from competing for specialized assignments are lawful as applied to them, because: 1) the plaintiffs do not qualify as "disabled" under the Act; 2) the plaintiffs cannot perform the"essential functions" of the positions they seek; 3) it would impose an "undue hardship" on the City to require it to accommodate the plaintiffs by waiving the disputed policies; and 4) the modified-duty-assignment policy is a reasonable accommodation satisfying the ADA's mandate.
 
 
 15
 The district court consolidated the two actions. All parties then moved for summary judgment, and the district court entered an order in favor of the City. In arriving at its decision, the court did not consider the City's claim that the plaintiffs are not "disabled" for purposes of the ADA.[5] Rather, it granted the City's motion on the ground that the plaintiffs are not "qualified individuals" because they cannot perform the essential function of "effect[ing] a forcible arrest, control[ling] a combative or escaping individual and respond immediately to physical threat or widespread emergency crisis." The district court agreed with the City that the performance of these duties is an essential function of all specialized assignments, even though specialized assignments are not patrolofficer positions.
 
 
 16
 The district court stated that because there is no accommodation that would enable the plaintiffs to perform these functions, the plaintiffs are not "qualified individuals," and therefore the court need not reach the City's argument that it actually did provide a reasonable accommodation --modified-duty assignments. It commented, however, that it considered the modified-duty assignments to be a reasonable accommodation, and characterized the plaintiffs' complaints as "look[ing] a gift horse in the mouth. " Believing otherwise, the plaintiffs filed this appeal.
 
 II. DENIAL OF SPECIALIZED ASSIGNMENTS
 
 17
 The ADA prohibits employment discrimination only against "qualified individual[s]" with disabilities. 42 U.S.C. §§ 12112(a). A "qualified individual" with a disability is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §§ 12111(8) (emphasis added). If a disabled person cannot perform a job's "essential functions" (even with a reasonable accommodation), then the ADA's employment protections do not apply. If, on the other hand, a person can perform a job's essential functions, and therefore is a qualified individual, then the ADA prohibits discrimination in regard to, inter alia, "job application procedures, . . . hiring, . . . [and] advancement." 42 U.S.C. §§ 12112(a). "Discriminate" is defined as including the use of "qualification standards . . . or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard . . . or other selection criteria, as used by the [employer], is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. §§ 12112(b)(6).
 
 
 18
 The critical question on this appeal is whether, assuming the facts to be as the plaintiffs have presented them, making forcible arrests and subduing fleeing suspects constitutes an "essential function" of all specialized-assignment positions in the San Jose Police Department. The parties dispute this point. The plaintiffs do not contend, however, that, if the City prevails on this question, there is a "reasonable accommodation" that will enable them to perform the function at issue. Accordingly, the plaintiffs can be "qualified individuals" for purposes of the Act only if the making of forcible arrests and the subduing of fleeing suspects is not an essential function of the specialized-assignment positions they seek.
 
 
 19
 The City also argues that, even if the plaintiffs can perform the job's essential functions, and thus are qualified individuals, its qualification standards for specialized assignments, which require that all officers given such assignments have served as patrol officers in the preceding year (and that they return to patrol duty after each three-year period of performing such assignments), are lawful as applied to the plaintiffs. The City further argues that waiving the pertinent qualification standard in the case of officers with disabilities would impose an "undue hardship" on it.[6] However, under the ADA, the question of "undue hardship" arises only when an accommodation is necessary to enable a disabled person to perform a job's essential functions and the proposed accommodation is "reasonable."[7] In such cases, the next question is whether that accommodation would create an "undue hardship" for the employer. The undue hardship question does not arise in this case, however, because the plaintiffs do not seek an accommodation, reasonable or otherwise. They simply urge that the job function that they are unable to perform is not an "essential" one, that they therefore are "qualified individuals," and that, accordingly, discrimination on the basis of their disabilities is unlawful.
 
 
 20
 Assuming that the plaintiffs here are "qualified individuals," there still remains a question: whether the City's qualification standards "discriminate" under the Act. That is because, while the Act defines "discriminate" as including the use of "qualification standards . . . that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities," 42 U.S.C. §§ 12112(b)(6), it also contains an exception that permits such qualification standards to be used if they are "shown to be job-related for the position in question and [are] consistent with business necessity." Id. There are, thus, two sub-questions involved. First, do the City's qualification standards screen out or tend to screen out officers with disabilities, and, second, if so, can the City demonstrate that its policies qualify under the business necessity exception?[8]
 
 
 21
 In sum, we first consider whether the plaintiffs are, as they assert, "qualified individuals," or whether, as the City contends, the making of forcible arrests is an "essential function" of all specialized-assignment positions and the plaintiffs are thus not qualified to perform any of them. We then consider the City's argument that its officer transfer or rotation policy is lawful as applied to the plaintiffs. While the City asserts the defense that waiving its transfer or rotation policy in the case of disabled officers would impose an "undue hardship" on its police force, the proper argument is that the policies are "job-related" and "consistent with business necessity." It is in the latter context that we will examine the City's "hardship" arguments.[9]
 
 
 22
 A. The making of forcible arrests.
 
 
 23
 The City requires all officers holding specialized-assignment positions to be able to make forcible arrests, and asserts that the making of such arrests is an "essential function" of these positions. The ADA explains that, when determining whether a job requirement is an "essential function," "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. §§ 12111(8). However, such evidence is not conclusive; "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description." Echazabal v. Chevron USA, Inc., 226 F.3d 1063, 1071 (9th Cir. 2000).
 
 
 24
 The Equal Employment Opportunity Commission (EEOC) regulations interpreting the ADA explain that a job's "essential functions" are its "fundamental" duties, not the "marginal functions of the position." 29 C.F.R. §§ 1630.2(n)(1). While the City's job descriptions make clear that being able to make a forcible arrest is currently a requirement for all police-officer positions except for modified-duty assignments, the plaintiffs have introduced significant evidence that the making of such arrests is not an "essential function " of all specialized-assignment positions.[10]
 
 
 25
 The plaintiffs cite the deposition of a sergeant in the Fraud Unit, Donald Black, who testified that being able to serve arrest warrants and make arrests is not, for all practical purposes, part of being a fraud investigator. Further, Black testified that officers with back problems that make them unfit for street patrol "would make good background investigators, good internal affairs investigators, [and] good recruiters." His statements were not mere conclusory allegations -they were based on his first-hand experience gained by working for the force in a supervisory capacity. Perhaps even more significant, he testified that for a period of twenty to twenty-five years, starting well before the inception of the modified-duty policy, disabled officers who were not specifically placed on special status by the Department have been performing the essential functions of investigative positions. Other testimony from a former Chief of Police, Chief Cobarruviaz, includes the admission that making forcible arrests is not an essential function of training officers in the Bureau of Administration.
 
 
 26
 The City has introduced its own evidence to the contrary. It cites the testimony of a police captain that being an investigator is a very active job that is "quite physically demanding." Another captain in the Bureau of Investigations stated in his declaration that investigative officers must be able to make arrests. But this evidence only demonstrates that a factual dispute exists over whether the function in question is essential; it does not support the granting of summary judgment to the City.
 
 
 27
 The City contends that, notwithstanding the existence of the dispute of fact, given the reality of police work, the per se requirement that all officers, except those on modified-duty status, be fully capable of making forcible arrests is justified. It argues that we approved of a similar per se policy in Kees v. Wallenstein, 161 F.3d 1196 (9th Cir. 1998). In Kees, we affirmed the district court's order granting summary judgment for jail officials on the question whether the ability to handle "inmate contact" was an essential function of jail guards assigned to "light duty" in the jail's "control room," a position that did not generally require such contact. Id. at 1199. However, the plaintiffs in Kees conceded that, in all jail jobs, some inmate contact was "inevitable," and "th[e] ability to restrain inmates during an emergency is critical to jail security." Id. In contrast, in the case of San Jose police officers, there is a factual dispute as to whether it is "inevitable" that investigators, or, for another example, training officers, will be called upon to make forcible arrests and whether, in the case of an emergency, it is actually necessary for all officers to be available for patrol duty.
 
 
 28
 In fact, given the record before us, the City's contention that all specialized-duty and patrol officers must be capable of making forcible arrests in the event of emergencies that require the Department to deploy all of its officers is entirely unpersuasive. The plaintiffs do not seek to expand the number of disabled officers permitted on the force and thus, the number who would be unable to make forcible arrests should a city-wide emergency arise.[11] Rather, they seek only the opportunity to serve in positions that are not currently designated as "modified duty." The City has offered no reason why the reassignment of some officers from modified-duty positions to other assignments would have an effect on the overall ability of the Department to respond to emergencies that require a maximum response. No matter what particular assignments the thirty disabled officers may hold, there still would be the same thirty officers on the force who could not be pressed into action for the purpose of making forcible arrests, and there still would be the same number of able-bodied officers, more than one thousand, who could. The number in each category would remain constant regardless of the nature of the disabled officers' duties.[12]
 
 
 29
 For the reasons discussed above, including the conflict in the evidence regarding the essential functions of various specialized assignments, we conclude that there is a factual dispute as to whether the ability to make a forcible arrest is an essential function of all the specialized-assignment positions that the plaintiffs seek the opportunity to fill, notwithstanding the job descriptions that the Department has prepared.
 
 
 30
 B. The officer transfer policy.
 
 
 31
 The City contends that, even if the making of forcible arrests is not an essential function of all specialized-assignment positions, the Act still does not require that it allow officers with disabilities to compete for specialized assignments because doing so would be contrary to the provisions of the City's Officer Transfer Policy. As explained above, that policy generally requires all officers to serve in a beat-patrol assignment for the twelve months immediately prior to their obtaining a specialized assignment, and to return to a beat-patrol assignment after three years in a specialized-assignment position.[13] Because the plaintiffs' disabilities prevent them from performing beat-patrol assignments, the City's policy renders them categorically ineligible for specialized assignments.
 
 
 32
 For purposes of the ADA, the Officer Transfer Policy is a "qualification standard" that must be met in order to obtain the positions the plaintiffs seek. If that standard serves to "screen out . . . a class of individuals with disabilities," it is lawful only if it is "shown to be job-related for the position in question" and "consistent with business necessity." 42 U.S.C. §§ 12112(b)(6). However, the City, rather than arguing that the policies are "job related" and justified by "business necessity," contends that waiving the policy in the case of persons with disabilities is not a "reasonable accommodation" because it would impose an "undue hardship" on the City.[14]
 
 
 33
 As we have stated earlier, what the plaintiffs are demanding in this case is not a "reasonable accommodation." Reasonable accommodations are mechanisms to remove barriers or provide assistance to disabled individuals so that they can perform the "essential functions" of employment positions. Here, the plaintiffs contend that they are capable of performing the "essential functions" of the positions they seek, and neither desire nor require any accommodation in order to do so. Instead, the plaintiffs are demanding that the City stop applying "qualification standards" that discriminate against them on the basis of disability.
 
 
 34
 There can be no question that the City's officer transfer policies are "qualification standards" that"screen out . . . a class of individuals with disabilities." The policies establish minimum requirements for enabling officers to compete for specialized-assignment positions. The requirement that in order to obtain a specialized assignment, an officer must have performed patrol service the preceding year (and that he must return to patrol service after performing the specialized assignment for three years) renders officers on modified-duty status and only officers on modified-duty status -that is, only disabled officers -categorically ineligible for specialized assignments, because only those officers are unable to perform beat-patrol service. Thus, the Officer Transfer Policy may not be applied to disabled officers unless it is"shown to be job-related and . . . consistent with business necessity." Id.
 
 
 35
 The City has the burden of proving that its discriminatory "qualification standards" satisfy the "business necessity" defense. Andrews v. Ohio, 104 F.3d 803, 807-08 (6th Cir. 1997). The "business necessity" standard is quite high, and "is not [to be] confused with mere expediency. " Bentivegna v. United States Dep't of Labor, 694 F.2d 619, 621-22 (9th Cir. 1982) (interpreting the term "business necessity " for purposes of the Rehabilitation Act of 1973). Such a necessity must "substantially promote" the business' needs. Id. at 622. Furthermore, the employer must demonstrate that the qualification standard is necessary and related to "the specific skills and physical requirements of the sought-after position." Belk v. Southwestern Bell Tel. Co., 194 F.3d 946, 951 (8th Cir. 1999). We have had little occasion to apply that defense, although in one case we held it sufficient to render non-discriminatory a medical examination when an employee's "health problems have had a substantial and injurious impact on an employee's job performance." Yin v. California, 95 F.3d 864, 868 (9th Cir. 1996).
 
 
 36
 As noted above, the City framed its business necessity defense incorrectly, in terms of "undue hardship."[15] The undue hardship standard is used to determine whether it is too onerous for a particular employer to make a specific accommodation sought by a specific employee, given the employer's size, economic circumstances, and other relevant conditions. This test, while strict, is less stringent than the "business necessity" standard, which requires employers to demonstrate that qualification standards that discriminate against a class of disabled employees are nevertheless permissible because it is necessary for the operation of the employer's business. To excuse a generally discriminatory provision, which is what the business necessity defense does, certainly requires more of a showing than is needed to excuse an employer from accommodating a specific employee under the undue hardship standard.
 
 
 37
 Because the business necessity standard is more stringent than the undue hardship standard, it follows that if the City's arguments are insufficient to meet the undue hardship standard, then, a fortiori, they fall short of establishing a business necessity defense. On this understanding, we now consider the various undue hardship arguments advanced by the City.
 
 
 38
 1. Readiness for patrol duties.
 
 
 39
 The City first argues that, in the words of the Acting Chief, "because of the importance of the patrol function, the Department is geared toward ensuring that all officers are exposed to Patrol and its enforcement duties." In other words, officers are required to perform patrol duties periodically rather than spending their entire careers in specialized assignments, so that they will always be capable of performing patrol assignments should the necessity arise.
 
 
 40
 According to the Acting Chief, it is to promote this policy that the force requires that all officers who serve in specialized assignments rotate back into patrol positions. Of course, this rationale could not possibly justify prohibiting officers currently assigned to modified-duty positions from serving in specialized duty positions, because such officers are not expected ever to perform patrol assignments. In other words, unlike in the case of able-bodied officers, the City's rotation policy cannot have any effect on the ability of disabled officers to serve as patrol officers in the future, because these officers are not, and never will be, capable of serving, or expected to serve, as patrol officers. Accordingly, the City's "readiness for patrol duties" argument provides no support for its contention that applying the applicability of the transfer policy to all but the thirty officers with disabilities would constitute an "undue hardship." More pertinent, but for the same reasons, the argument provides no support whatsoever for the conclusion that a "business necessity" justifies applying the rotation policy to officers with disabilities.
 
 
 41
 2. Officer training.
 
 
 42
 The Acting Chief also contends in his affidavit that specialized assignments are part of the Department's tools to train patrol officers in a wide variety of disciplines, and to prevent burn-out of patrol officers by providing them with other assignments on a temporary basis. While the Acting Chief's affidavit provides evidence for the proposition that eliminating the rotation policy for all officers would undermine the morale or well-being of the force, it does not offer any support for the contention that failing to apply the policy to the thirty disabled officers would have an adverse effect on the Department.
 
 
 43
 Assuming that every year all officers who are performing patrol duty apply for specialized assignments, it appears, as a matter of simple mathematics, that the effect of permitting the thirty officers who perform modified-duty assignments to compete for specialized assignments would be negligible: it would serve only to reduce the chance that any particular officer performing patrol duty would receive a specialized assignment position from 27.3 percent to 26.2 percent annually.[16] The City certainly has presented no evidence suggesting that the 1-percentage point differential in the opportunity of a particular patrol officer to rotate into a specialized-assignment position in any year would have a significant effect on the City's ability to train its officers or to prevent burn-out. In light of the above, we conclude that the evidence presented by the City not only does not show an "undue hardship" but fails completely to provide any support for a "business necessity" defense.
 
 
 44
 C. Divergence from collective bargaining agreement.
 
 
 45
 The City next argues that the failure to apply the requirements of the Officer Transfer Policy to the plaintiffs would require a divergence from its collective bargaining agreement with the police union, and that it cannot be required to take any action inconsistent with that agreement. The ADA makes clear, however, that the term "discriminate" includesparticipating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with [a] . . . labor union . . . ).
 
 
 46
 42 U.S.C. §§ 12112(b)(2). As explained above, the City's contract with the police union has the "effect" of subjecting the plaintiffs to "discrimination" by imposing impermissible "qualification standards" that "screen out " the class of disabled officers. Thus, the provision is discriminatory and cannot survive under the Act, unless some exception applies.
 
 
 47
 The City asserts that requiring it to diverge from its collective bargaining agreement is a per se "undue hardship." In Willis v. Pacific Maritime Ass'n, 244 F.3d 675 (9th Cir. 2001), we recently considered whether diverging from a collective bargaining agreement's seniority provisions imposes an undue hardship. We held there that an accommodation that is contrary to the seniority rights of other employees set forth in collective bargaining agreement would be unreasonable per se. Id. However, we specifically limited the rule we announced in Willis to "bona fide seniority system[s]," and explained that "[o]ur decision does not preclude an employee from arguing that a proposed accommodation is reasonable despite a conflict with a [collective bargaining agreement] provision that does not contain a bona fide seniority system." Id. at 682.
 
 
 48
 The question, here, of course, does not involve the reasonableness of an accommodation or whether an accommodation would impose an undue hardship on an employer. The issue in this case is whether the City can establish a valid business necessity defense. We need not decide, however, whether the Willis rule applies to the question of "business necessity," because the plaintiffs in this case do not seek to modify or to bypass the seniority system established in the collective bargaining agreement. The City's Officer Transfer Policy (which was subject to the bargaining process) provides that specialized assignments are to be filled through a competitive procedure and not on the basis of seniority. The disabled officers simply seek the opportunity to compete with able-bodied officers fairly and openly under the procedure, by eliminating the rules that categorically bar them from receiving specialized assignments. To the extent that seniority is a factor in the competition -and it is a minor one, see n.17 infra -allowing disabled officers to compete would in no way require any changes in the contract's seniority provisions. Disabled officers would benefit or suffer from the seniority they have earned to precisely the same extent as non-disabled officers currently do. In this regard, the plaintiffs specifically acknowledge that they will have to compete with non-disabled employees for specialized-duty assignments on the basis of the terms set forth in the collective bargaining agreement.[17]
 
 
 49
 In addition to its misguided Willis argument, the City asserts that varying the terms of the collective bargaining agreement might generate resentment on the part of other employees, and that such resentment would undermine the Department's morale. We have held, however, that resentment by other employees who are concerned about"special treatment" for disabled co-workers is not a factor that may be considered in an "undue hardship" analysis. See Wellington, 187 F.3d at 1156-67 (holding that, in a workplace not governed by a collective bargaining agreement, resentment by other employees is not a legitimate consideration when determining whether an accommodation should be made for a disabled employee). The rule we adopted in Wellington applies with equal force here. Resentment on the part of other employees does not provide a basis for a "business necessity" defense. The City has pointed to no other factor that might support its contention that modifying the agreement in the manner requested would result in undue hardship; nor has it offered any other argument that might support a"business necessity" defense.
 
 
 50
 The record makes clear that permitting disabled officers to compete for specialized assignments would serve to ensure fair competition, and would not give the plaintiffs a benefit denied to able-bodied officers. Under the circumstances, the City's contention that modifying the pertinent non-seniority requirements of the collective bargaining agreement would impose an "undue hardship" is without merit. Similarly, the City has wholly failed to carry its burden with respect to a "business necessity" defense.
 
 
 51
 D. Modified-duty as an alternative to specialized assignments.
 
 
 52
 The City claims that it has complied with the ADA because, rather than discharging disabled officers, it provides them with modified-duty assignments. Specifically, it contends that, even if the plaintiffs are qualified individuals with disabilities, it is still not liable for failing to allow them to compete for specialized-assignment positions because it has offered them other positions. In short, the City contends that because the plaintiffs have been assigned to modified-duty assignments, because those assignments are police-officer positions, and because modified-duty officers receive the same pay and benefits as other officers, the City has no obligation to permit them to perform the specialized-duty assignments they seek.
 
 
 53
 We reject the City's argument. The statute clearly requires that qualified disabled persons be allowed to compete for and accept the available "positions" that they seek to obtain not simply that such qualified persons be given other"positions" that are less desirable or that they may simply not desire. A "qualified individual with a disability" is defined as an individual who "can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §§ 12111(8) (emphasis added). It would be inconsistent with the purpose and objectives of the statute to hold that someone is "qualified" for a position that he"desires," and then to permit an employer to deny him that position on the ground that he has been afforded a different position that he does not desire.
 
 
 54
 The EEOC has made clear in its interpretive guidance that the City's argument is inconsistent with the ADA. The Commission explains that "[r]eassignment may not be used to . . . segregate . . . employees with disabilities by forcing reassignments to undesirable positions or to designated offices or facilities." 29 C.F.R. Pt. 1630 app. §§ 1630.2(o). Here, the plaintiffs point to evidence in the record showing that the City assigns modified duty officers to undesirable jobs in which they must work under degrading conditions to which able-bodied officers are not subjected. There is also evidence that disabled officers are denied rights afforded their able-bodied co-workers, even including the right to wear the police uniform. The EEOC's interpretive guidance, which we here adopt, and the text of the ADA, lead us to conclude that the assignment of an applicant to a position that he does not desire, instead of one he seeks, does not comply with the ADA's mandate.[18]
 
 III. OPPORTUNITY FOR PROMOTION
 
 55
 The plaintiffs claim that, in addition to prohibiting them from working in specialized assignments, the City's policies also prevent them from obtaining promotions. 42 U.S.C. §§ 12112(a) (prohibiting "discriminat[ion ] . . . in regard to . . . advancement"). With regard to this contention, the City argues that no evidence in the record supports the plaintiffs' claim. Of course, if disabled officers are not actually limited in their opportunities for promotion, then, even if the plaintiffs are qualified individuals with disabilities, their argument that the City's promotional policies violate the ADA fails.
 
 
 56
 Notwithstanding the City's assertions, the plaintiffs have pointed to significant evidence in the record that the City's policies prevent them from being promoted to sergeant because of their disabilities. They note that the City's practice of requiring newly promoted sergeants to spend their first eighteen months in the Bureau of Field Operations, and to perform patrol duties for the first twelve of these eighteen months, renders them categorically ineligible for promotion. Their evidence supporting this claim includes the deposition testimony of a former Chief of Police, as well as Officer Arvin's declaration, in which he states that an Assistant Chief advised him that his inability to "work the streets" rendered him ineligible for promotion.
 
 
 57
 In an effort to refute this claim, the City notes, accurately, that the Modified Duty Policy specifically states that "[m]odified duty status shall not, in and of itself, affect promotional opportunity."[19] Furthermore, it cites the deposition of a different former Chief of Police, who testified that "it would seem to [him]" that modified duty status is not a bar to promotion, and that assignment to the Bureau of Field Operations for eighteen months would not necessarily require a sergeant to serve in a patrol position. Consistent with this assertion, the City explained at oral argument that its policy requiring newly promoted Sergeants to spend their first eighteen months in the Bureau of Field Operations does not prohibit promotion of disabled officers because some parts of that Bureau perform non-patrol functions.[20]
 
 
 58
 At most, the City's evidence in refutation creates a genuine issue of fact as to whether its policies prevent disabled officers from being promoted. Accordingly, summary judgment on this question was also inappropriate.
 
 IV. STATE CLAIM UNDER FEHA
 
 59
 Officers Arvin and Phillips also filed a state claim under the California Fair Employment and Housing Act ("FEHA") raising the same issues. The district court exercised supplemental jurisdiction and granted summary judgment in favor of the City with respect to the state claim. The district court concluded that, for purposes of determining whether an individual is a qualified individual with a disability, California relies upon federal discrimination decisions. In short, it held that California interprets FEHA in the same manner that federal courts interpret the relevant federal civil rights statute. While the district court is correct that California courts will often look to federal statutes and apply federal law when the federal and state statutory provisions are sufficiently alike (and we recently said as much in Kohler v. Inter-Tel Techs., 244 F.3d 1167, 1172-1173 (9th Cir. 2001)), California courts have stated that in a number of instances FEHA's antidiscrimination provisions provide even greater protection to employees than do the comparable federal statutes, and FEHA itself makes this point explicit. See Cal. Gov't Code §§ 12926.1. For example, a recent California disability case held that the definition of "disability" under FEHA is more expansive than that provided in the ADA. See Jensen v. Wells Fargo Bank, 102 Cal. Rptr. 2d 55, 64 (Cal. Ct. App. 2000). Similarly, in the employment discrimination context, a California court recently stated that in some respects FEHA provides protections unavailable under Title VII. See Valdez v. Clayton Indus., 107 Cal. Rptr. 2d 15, 23, as amended 2001 WL 599820 (Cal. Ct. App. June 4, 2001). FEHA provides that "under the law of this state, `working' is a major life activity, regardless of whether the actual or perceived working limitation implicates a particular employment or a class or broad range of employments." Cal. Gov't Code §§ 12926.1(c). Thus, a judgment for a defendant as to an ADA claim will not necessarily lead to a similar judgment with respect to a FEHA claim. Conversely, however, a defendant who is not entitled to judgment with respect to an ADA claim, is a fortiori not entitled to one with respect to a FEHA claim. Accordingly, here, because we reverse on the ADA claims, we also reverse on the FEHA claims.
 
 V. CONCLUSION
 
 60
 We conclude that the district court erred in granting summary judgment for the City. Assuming the facts are as the plaintiffs have presented them, as we must when reviewing the summary judgment order in favor of the City, we conclude that the plaintiffs are not categorically unable to perform the essential functions of the "specialized assignments" they seek, even though they may be unable to make forcible arrests and subdue suspects. They are, rather, for purposes of this appeal, "qualified individual[s] with . . . disabilit[ies]." Accordingly, the ADA prohibits discrimination against them on the basis of their disabilities, in the absence of a valid "business necessity defense." No evidence that would support such a defense has been offered here. In addition, if the facts are as the plaintiffs have presented them, then the City's policies also unlawfully deny them the opportunity to advance to the rank of sergeant. Finally, the district court erred in ruling for the City on the FEHA claim. Accordingly, we REVERSE and REMAND for proceedings consistent with this opinion.
 
 
 61
 REVERSED AND REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Some of the facts in this appeal are disputed. Because we are reviewing an order granting summary judgment to the defendant, we must view the relevant facts in the light most favorable to the plaintiffs and accept their version of all disputed facts. Margolis v. Ryan , 140 F.3d 850, 852 (9th Cir. 1998). Accordingly, while many of the historical facts we discuss are undisputed, when the facts are in dispute, we set them forth in the light most favorable to the plaintiffs.
 
 
 [2]
 This opinion refers to three types of positions in the San Jose Police Department: beat-patrol assignments; modified-duty assignments, which are positions that are set aside for disabled officers; and specialized assignments, which are all assignments other than beat-patrol and modified-duty assignments. While modified-duty assignments, if performed by able-bodied officers, might be considered specialized assignments because they are not beat-patrol assignments, (although in direct contrast to other specialized assignments, they are highly undesirable), for purposes of clarity, this opinion uses the three categories described above.
 
 
 [3]
 Officer Cripe suffers from neck and back injuries. Officers O'Keefe and Palmer suffer from back injuries. Officer Fearheiley suffers from neck injuries, and the pain has radiated to his forehead, left arm, and both legs. Officer Arvin suffers from injuries to his lower back and right ankle. Officer Phillips suffers from injuries to her neck and back, and suffers from upper extremity problems. The plaintiffs have introduced evidence that they are all limited in their ability to lift objects weighing more than from twenty-five to fifty pounds, and almost all of them have lost at least half of their pre-injury capacity to bend, stoop, lift, push, pull and climb. A seventh plaintiff, Brad J. Martin, was no longer a party to the action at the time the district court issued its summary judgment order.
 
 
 [4]
 In both actions, the plaintiffs initially named the police union as a defendant, in addition to naming the City. However, the union was dismissed as a party on the ground that the actions against it were precluded by a mandatory arbitration clause. The plaintiffs do not now appeal that ruling. In the district court, each set of plaintiffs filed an amended complaint that names only the City as a defendant.
 
 
 [5]
 The court noted that "the facts could be considered in dispute as to whether plaintiffs are disabled within the meaning of the Act." See n.8 infra.
 
 
 [6]
 Employers are only required to make "reasonable accommodations" that do not impose "undue hardships" on them. 42 U.S.C. §§ 12112(b)(5)(A). The Act contains a detailed set of criteria to consider in determining what constitutes an "undue hardship. " 42 U.S.C. §§ 12111(10).
 
 
 [7]
 In many cases, the question whether someone can perform the essential functions of a job is intertwined with the question whether an accommodation that would permit an employee to perform the job is a "reasonable accommodation" that does not impose an "undue hardship." See, e.g., Humphrey v. Memorial Hospitals Assoc., 239 F.3d 1128, 1135-37 (9th Cir. 2001). These questions are often inextricably linked because, under the ADA, when an employee needs an accommodation to perform a job's essential functions, the employee is a qualified individual (i.e. an individual with a disability who can perform the job's essential functions) only if the accommodation is reasonable and making the accommodation would not impose an "undue hardship" on the employer.
 
 
 [8]
 The City presents one additional reason for our consideration as to why the plaintiffs are not entitled to relief under the Act. It claims that the plaintiffs are not covered by the Act because they do not actually have "disabilities" as that term is defined by the ADA. 42 U.S.C. §§ 12102(2)(A). The district court did not rule on this question. Since the district court issued its order granting summary judgment, several cases have been decided setting forth what is required to show that a plaintiff is disabled. See, e.g., Sutton v. United Air Lines, Inc., 527 U.S. 471, 492 (1999) (questioning, without deciding, whether "working" is a major life activity); Broussard v. Univ. of Cal., at Berkeley, 192 F.3d 1252, 1258 (9th Cir. 1999) (giving no weight to vocational expert's conclusory affidavit); Wellington v. Lyon County Sch. Dist., 187 F.3d 1150, 1155 (9th Cir. 1999) (concluding that an employee could be found disabled even without evidence from a vocational expert). Furthermore, the Supreme Court has recently granted certiorari in Williams v. Toyota Motor Mfg., Ky., Inc., 224 F.3d 840 (6th Cir. 2000), cert. granted, 121 S. Ct. 1600 (2001), to consider whether "an impairment precluding an individual from performing only a limited number of tasks associated with a specific job qualifies as a disability under the [ADA.]" Petition for a Writ of Certiorari, Toyota Motor Mfg., Ky., Inc. v. Williams, (U.S. Jan. 5, 2001) (No. 00-1089). In light of these developments and the fact that the district court has not ruled on the issue, we decline, on this appeal, to consider the question whether the plaintiffs are disabled. We do so, in part, because we expect that the district court will afford the plaintiffs an opportunity to provide supplemental evidence before ruling on any renewed summary judgment motion by the City, so that they will have a fair opportunity to attempt to demonstrate, under the developing law in this area, as it may then exist, that their limitations on working and engaging in other life activities render them disabled.
 
 
 [9]
 Although the City has mislabeled its argument and identified the wrong standard, such error does not cause us to hold that it waived the "business necessity" defense. The City argued the relevant facts before the district court; that sufficiently put the plaintiffs and the court on notice of the actual issue the defendant should have specified. Where there exist closely related legal theories that are readily confused by litigants or judges, an appellate court should generally exercise jurisdiction over the related issues, even though the parties only identified one of them by its proper label. See, e.g., Benitez-Pons v. Commonwealth of Puerto Rico, 136 F.3d 54, 61 (1st Cir. 1998) (where plaintiff "muddle[d] the doctrines of equitable estoppel and equitable tolling [but] . . . assert[ed] elements of both doctrines, [the court] will analyze the equitable arguments under both estoppel and tolling theories"); Elmore v. Cone Mills Corp., 23 F.3d 855, 868 n.5 (4th Cir. 1994) (Murnaghan, Circuit J., concurring) (explaining that, where district court confused doctrines of promissory and equitable estoppel, court of appeal may rely on either doctrine).
 
 
 [10]
 The district court treated the term "position," as used in the statute, to apply to specific types of police officer positions (e.g. specific specialized-assignment positions), rather than to the general position of "police officer." On appeal, none of the parties contests the district court's construction of the statutory term "position." We also have no reason to question the validity of this approach; we believe it to be fully consistent with the purpose and intent of the Act.
 
 
 [11]
 We offer no opinion as to whether the City's policy limiting the number of disabled officers on the force to thirty violates the ADA or any other law. In this action, the plaintiffs do not seek to expand the total number of positions available to disabled officers.
 
 
 [12]
 The City (and the district court) also rely on an Eleventh Circuit opinion, Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522 (11th Cir. 1997), for the proposition that all police officers, no matter what their particular job, must be able to investigate crime scenes. A highly fact-specific inquiry is necessary to determine what a particular job's essential functions are. Hoskins v. Oakland County Sheriff's Dep't, 227 F.3d 719, 726 (6th Cir. 2000); Ward v. Massachusetts Health Research Inst., Inc., 209 F.3d 29, 35 (1st Cir. 2000); Holbrook, 112 F.3d at 1527. The facts of Holbrook could not be more dissimilar from this case. In Holbrook, the plaintiff, whose impairment prevented him from driving to and from investigating crime scenes, was one of only three detectives on the City's tiny force. Id. at 1525, 1528 n.4. Because the facts of Holbrook are so dissimilar from this case, and the inquiry of what is an essential function is so fact-specific, we conclude that Holbrook does not afford any guidance with respect to the decision to be made on this appeal.
 
 
 [13]
 There is an exception to the beat-patrol requirement for officers over the age of fifty who have completed twenty-five years of active service. Furthermore, the policy provides the Assistant Chief of Police with the authority to waive the time limitation and to grant indefinite extensions of the period during which an individual may hold a particular specialized assignment. These exceptions cast significant doubt on the importance of absolute adherence to the basic rotational policies. The City does not explain why, if exceptions are made for the presumably limited number of older officers and for individuals designated by the Assistant Chief, they cannot also be made for the limited number of disabled officers.
 
 
 [14]
 For reasons we have explained in n.9, supra, we overlook the City's failure to raise the "business necessity" defense, as such, and treat its erroneous reliance on the "undue hardship" issue as being adequate to preserve the former issue.
 
 
 [15]
 The term "undue hardship " is defined at 42 U.S.C. §§ 12111(10). The statute does not, however, contain definitions for the terms "job-related" or "business necessity."
 
 
 [16]
 This calculation is based on the City's personnel data, contained in the record, that shows that of the 1026 police officers on the force, 546 work in "Field Operations Patrol" assignments. The calculation assumes that specialized assignments last for three years, which is their typical duration, and that each year, one third of all specialized assignments become available. In fact, the percentage differential would be even less were some of the modified-duty officers to obtain specialized assignments and thus not be part of the group eligible to apply for openings for the following three years.
 
 
 [17]
 Qualifying criteria for specific specialized assignments are determined by unit commanders. Officers who meet these criteria then compete for assignments through "written exams," "practical exams," and "interview exams." Extra "seniority points" are added to applicants' exam scores on the basis of length of service with the San Jose Police Department. The plaintiffs do not seek waiver or modification of the requirement that they be subject to the policy adding "seniority points " for length of service.
 
 
 [18]
 We do not consider here the case in which, for a lawful and non-discriminatory reason, the position the disabled person seeks is not available. Whether, in that circumstance, the offer of a comparable position would be sufficient, or even required, is a question we need not answer here. See 42 U.S.C. §§ 12111(9)(B).
 
 
 [19]
 However, the same paragraph of the policy states that disability "shall not be considered in the promotional process except to the extent such disability adversely affects an individual's ability to perform the duties of the promotional position." (emphasis added). The policy is silent as to whether an officer's inability to perform a patrol assignment necessarily "affects an individual's ability to perform" an entry-level sergeant job, and whether, therefore, any modified-duty officers actually could be promoted.
 
 
 [20]
 Of course, if the plaintiffs' allegations are to be believed, as they must for purposes of the defendant's summary judgment motion, then we must recognize that the first twelve of these eighteen months must be in served in "district assignments" within the Bureau of Field Operations, which assignments require the performance of patrol duty.