**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 98-50345
_____

JEFF KAPCHE,

Plaintiff-Appellant,

versus

CITY OF SAN ANTONIO,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Western District of Texas

_____

May 20, 1999

Before JOLLY, WIENER, and PARKER, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellant Jeff Kapche appeals the district court's grant of summary judgment dismissing his employment discrimination claims against the City of San Antonio on the ground that, under Fifth Circuit precedent, a driver with insulin-dependent diabetes poses a direct threat to the health and safety of others, as a matter of law. In light of changes to the federal regulations on which our precedent was partly based, as well as possible advancements in medical technology, we vacate the district court's order and remand the case for a determination of the continued viability of this per se rule.

**I**

**FACTS AND PROCEEDINGS**

Kapche is an insulin-dependent diabetic who, in February 1994, applied for employment as a police officer with the San Antonio Police Department ("SAPD" or "the department"). In accordance with the department's policy, Kapche engaged in a three-step application process, consisting of a written examination, a background check, and a physical/mental examination. Following Kapche's medical exam, Ariel Hernandez, M.D. —— the department's staff physician —— notified the department that Kapche had insulin-dependent diabetes mellitus, and that such condition was disqualifying for the position of police cadet. Thereafter, despite Kapche's successful completion of both the written test and the background check, the department removed Kapche's name from its eligibility list.[1]

Kapche appealed the SAPD's decision and requested that a panel of physicians review his physical capabilities.[2] The two reviewing doctors —— Vijay Koli, M.D., and Bruce Brockway, M.D. —— confirmed Dr. Hernandez's initial evaluation, concluding that, because of

_____

[1]Kapche received a rejection notice stating: "We are sorry to inform you that you have been disqualified on your physical/mental examination, and we are at this time removing your name from the eligibility list for the position of police cadet. You were disqualified because of: <u>Insulin dependent diabetic [sic] mellitis [sic] is disqualifying</u>."

[2]Texas law entitles a disqualified applicant to physical examinations conducted by a panel of three physicians. For job processing to resume, two of the three reviewing physicians must overturn the applicant's initial disqualification.

Kapche's diabetes, he did not meet the requirements for the job.[3]
Thereafter, following the exhaustion of his state administrative
remedies, Kapche brought suit in federal district court alleging
that the SAPD "refused to hire [him] because of a physical
condition that does not impair [his] ability to reasonably perform
a job" in violation of the Americans with Disabilities Act ("ADA"
or the "Act"),[4] and the Texas Commission on Human Rights Act
("TCHRA").[5]

In response, the City filed a motion for summary judgment
which the district court granted in part.[6] Relying on Chandler v.
City of Dallas,[7] and Daugherty v. City of El Paso,[8] the court held
that, as a matter of law, Kapche is not qualified to be a police
officer because his diabetic condition "presents a genuine
substantial risk that he could injure himself or others."  Kapche

---

[3]After two physicians confirmed Kapche's disqualification,
there was no longer any chance that Kapche would get the majority
vote needed to overturn Dr. Hernandez's decision.  Consequently, it
seems, Kapche did not receive a third appellate examination.

[4]42 U.S.C. §§ 12101-213 (1997).

[5]TEX. LAB. CODE ANN. § 21.105 (Vernon 1996).

[6]Likewise, Kapche moved for and was granted, in part, summary
judgment on the issue of the City's liability for conducting a pre-
offer medical examination in violation of 42 U.S.C. § 12112(d).
Because Kapche was subsequently unable to establish proof of
damages resulting from the premature exam, however, the district
court granted summary judgment in favor of the City on this issue.
Kapche did not appeal the district court's order.

[7]2 F.3d 1385 (5th Cir. 1993).

[8]56 F.3d 695 (5th Cir. 1995).

filed a motion for reconsideration which was denied.  He now seeks relief on appeal.

## II

## ANALYSIS

**A.    Standard of Review**

We review a grant of summary judgment <u>de novo</u>, applying the same standard as the district court.[9]  Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and shows that the moving party is entitled to judgment as a matter of law.[10]

**B.    The ADA**

The ADA makes it unlawful for an employer to discriminate against a "qualified individual with a disability" because of that individual's disability.[11]  To prevail on a claim under the Act, a plaintiff must prove that (1) he has a "disability", (2) he is "qualified" for the position in which he seeks employment, and (3) an adverse employment decision was made because of his disability.[12]

As defined under the Act, a "disability" includes "a physical

---

[9]<u>Melton v. Teacher's Ins. & Annuity Ass'n of America</u>, 114 F.3d 557, 559 (5th Cir.1997).

[10]<u>River Prod. Co., Inc. v. Baker Hughes Prod. Tools, Inc.</u>, 98 F.3d 857, 859 (5th Cir.1996) (citing FED.R.CIV.P. 56(c)).

[11]42 U.S.C. § 12112(a)(1997).

[12]<u>Buchanan v. City of San Antonio</u>, 85 F.3d 196 (5th Cir. 1996).

4

or mental impairment that substantially limits one or more of the major life activities."[13] A "qualified individual with a disability" is a disabled person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."[14] As a general rule, an employer may develop and use qualification standards or other selection criteria in an attempt to screen out individuals who cannot perform the essential functions of the job.[15] According to the Act, an employer may require, for example, that an employee not pose a "direct threat" to other individuals in the workplace.[16] Despite the leeway an employer is granted in the determination of who it will and will not hire, if an employer imposes eligibility requirements that tend to screen out the disabled, that employer will be deemed to have "discriminated" under the Act, unless it can prove that application of a particular standard or criterion is "job-related" and "consistent with business necessity."[17]

## C.  Qualified Individual with a Disability

The City concedes that Kapche's insulin-dependent diabetes

---

[13]42 U.S.C. § 12102(2)(A)-(C)(1997).

[14]Id. at § 12111(8)(1997).

[15]29 C.F.R. § 1630.2(m) & (q)(1998).  See also 42 U.S.C. § 12113(a)(1997);

[16]42 U.S.C. § 12113(b)(1997)(emphasis added).

[17]Id. § 12112(b)(6)(1997).

renders him disabled, and that Kapche was eliminated from the application process because of this disability. Consequently, the only issue in dispute is whether, with or without accommodation, Kapche is <u>qualified</u> to perform the <u>essential functions</u> of the job.

## 1. Essential Functions

"Essential functions" are those duties that are fundamental to the job at issue.[18] In holding Kapche unqualified for the position of police officer, the district court assumed, without finding, that Kapche would be required to drive a vehicle as an essential function of his job. In his motion for reconsideration and again on appeal, Kapche challenges the factual support for this assumption.

According to the EEOC's implementing regulations, a job function may be considered essential if, for example, (1) the purpose of the position is the performance of that function, (2) only a limited number of employees are available among whom the performance of that function can be delegated, or (3) an employee is hired because of his expertise or ability to perform a specialized function.[19] To aid in the determination of whether a function is essential, a court may consider as evidence a variety of factors including, but not limited to, (1) the employer's judgment as to which functions are essential, (2) written job

---

[18]29 C.F.R. § 1630.2(n)(1)(1998).

[19]<u>Id.</u> § 1630.2(n)(2)(i)-(iii)(1998).

descriptions prepared before advertising or interviewing applicants for the job, (3) the amount of time spent on the job performing the function, and (4) the work experience of both past and current employees in the job.[20]

In the instant case, the City offered as evidence a declaration from the deputy chief of police that, to become an officer with the SAPD, an applicant is required to complete a six month training course. As an integral part of this course, the applicant undergoes instruction in defensive and high performance driving. The evidence further shows that, on completion of his training, a new police officer is placed on probation for a period of one year, during which time he is assigned, without exception, to serve in the Patrol Division of the department. As part of his service as a patrolman, an officer must have his police vehicle with him whenever he is on duty. According to the "City of San Antonio Functional Job Analysis," entered into evidence by Kapche, an officer position with the SAPD requires use of a vehicle 60% of the time. Although there is evidence to suggest that some officers do hold "desk jobs," it is also clear from the record that these jobs are only available to individuals who have completed both the training course and the probationary period of service. None is hired anew to fill a desk job.

Based on our de novo review of the summary judgment evidence,

---

[20]Id. § 1630.2(n)(3)(i)-(vii)(1998).

7

we conclude that Kapche has failed to raise a fact question about whether driving is an essential function of the SAPD police job for which he applied.

## 2. Direct Threat

Having determined that driving is an essential function, we now turn to the question whether Kapche is <u>qualified</u>, with or without accommodation, to perform this function. The City answers this question in the negative, insisting that Kapche's diabetic condition would prevent him from being able to conduct his police work — his driving responsibilities, in particular — safely. In other words, the City claims, Kapche is a "direct threat."

To constitute a direct threat, an individual must pose a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."[21] According to the EEOC's implementing regulations, the determination that a person poses a direct threat <u>shall</u> be based on an individualized assessment of the person's "present ability to safely perform the essential functions of the job."[22] In <u>Chandler v. City of Dallas</u>[23] and <u>Daugherty v. City</u>

---

[21]42 U.S.C. § 12111(3)(1997).

[22]29 C.F.R. § 1630.2(r)(1998)(providing also that such assessment "shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence" and listing four factors relevant to the determination of whether an individual would pose a direct threat). <u>See also</u> <u>Rizzo v. Children's World Learning Ctrs.</u>, 84 F.3d 758, 763 (5th Cir. 1996).
There is nothing in the express language of the Act that requires an individualized assessment of job applicants. When a statute is silent on an issue, however, courts should defer to the

of El Paso,[24] however, we created a tacit exception to this case-by-case approach, holding that drivers with insulin-dependent diabetes pose a direct threat as a matter of law.[25]  It is to consider the continued viability of this exception ⸺ both (1) as a general principle, and (2) in the specific context of drivers with insulin-dependent diabetes ⸺ that the remainder of this opinion is devoted.

In Chandler, plaintiffs filed a class action suit against the City of Dallas after it adopted a driver safety program that established physical standards for city employees who were Primary Drivers, i.e., those employees required to drive on public roads as an intrinsic part of their job.  The standards established by the program were patterned on safety regulations promulgated by the United States Department of Transportation ("DOT").[26]  If an

---

administering agency's regulation, as long as that regulation is based on a permissible construction of the enabling statute.  See Chevron v. Natural Resources Defense Council, 467 U.S. 837, 843-44 (1984).

[23]2 F.3d 1385 (5th Cir. 1993).

[24]56 F.3d 695 (5th Cir. 1995).

[25]Chandler, 2 F.3d at 1395; Daugherty, 56 F.3d at 698.

[26]At the time Chandler was decided, 49 C.F.R. § 391.41 (1992) provided in pertinent part:
    (a) A person shall not drive a motor vehicle unless he is physically qualified to do so . . . .
    (b) A person is physically qualified to drive a motor vehicle if that person ⸺
    . . .
    (3) Has no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control;

employee did not meet these standards, he was classified as ineligible for Primary Driver jobs. Included in these standards was the requirement that a driver _not_ have an established medical history of diabetes mellitus severe enough to require insulin control.

Chandler, an insulin-dependent diabetic, did not contest the City's assertion that driving was an essential function of every Primary Driver position. Instead, argued Chandler, he was qualified to perform this function without accommodation. Because the City's program classified insulin-dependent diabetics as ineligible _per se_ for Primary Driver positions, Chandler contended that the program discriminated against him in violation of the Rehabilitation Act.[27]

We rejected Chandler's argument, holding that, _as a matter of law_, a driver with insulin-dependent diabetes presents a genuine substantial risk of injury to both himself and others. In a footnote, we tempered this holding by expressing our hope that someday "methods of control may become so exact that insulin-dependent diabetics will present no risk of ever having a severe

. . . .

[27]The Rehabilitation Act prohibits discrimination against an otherwise qualified individual with a handicap (now an individual with a disability) in programs that receive federal financial assistance. The Rehabilitation Act defines an "individual with handicaps" in substantially the same terms as the ADA defines a "disability." See 29 U.S.C. § 706(8)(B)(1998); 42 U.S.C. § 12102(2)(A)-(C)(1997).

hypoglycemic episode" and that "exclusions on a case by case basis will be the only permissible procedure."[28]  Given the medical climate at the time, however, we concluded that an insulin-dependent diabetic is <u>not qualified</u> for positions that require driving as an essential function, absent proof that a reasonable employer accommodation will eliminate the safety risk posed by that driver.  As Chandler failed to produce evidence that reasonable accommodation was possible, or that such accommodation would eliminate the safety risk inherent in his driving, we concluded that Chandler was not qualified for the job.

In <u>Daugherty</u>, we extended our holding in <u>Chandler</u> to plaintiffs seeking relief under the ADA.  Daugherty was fired from his part-time permanent position as a public bus driver with the City of El Paso after being diagnosed as an insulin-dependent diabetic.  At trial, the parties conceded that extant DOT regulations prohibited individuals with insulin-dependent diabetes from operating commercial motor vehicles, i.e., those that weigh over 26,001 pounds or buses which seat more than 16 passengers.[29] Daugherty did not contend that he was qualified without accommodation to perform the essential functions of a city bus

---

[28]<u>Chandler</u>, 2 F.3d at 1395 n.52.

[29]56 F.3d at 697.  As the driver of a public bus –– a commercial motor vehicle –– Daugherty was required to have a commercial driver's license (a "CDL").  49 C.F.R. § 383.23(a)(2) (1994).  To obtain a CDL, federal law required that he meet certain physical qualifications, including the absence of insulin-dependent diabetes.  49 C.F.R. §§ 383.71(a)(1), 391.41(b)(3)(1994).

driver, i.e. driving.  Rather, he contended that the City should have reasonably accommodated him by requesting a waiver of the federal regulations from the Department of Transportation or by reassigning him to another position.

Although we acknowledged that a waiver might overcome the legal impediment to Daugherty's driving, we also noted that such a waiver would not address the safety concern stated in Chandler. Hence, we held that, under the ADA, an insulin-dependent diabetic is not qualified for the position of bus driver, as a matter of law.  As Daugherty failed to demonstrate that he had been treated differently from any other part-time employee whose job was eliminated, we further concluded that the City did not violate its reasonable accommodation obligation under the ADA.

**(i)  Exceptions to the Individualized Assessment Rule**

In light of our holdings in Chandler and Daugherty, it appears, at least on first blush, that employers in this circuit may exclude an insulin-dependent diabetic (like Kapche) from a job that requires driving (like that of police officer) without ever conducting an individualized assessment of the applicant's actual ability to perform the job safely.  Unfortunately, absent from our written reasons in either Chandler or Daugherty is any attempt to square this outcome with the EEOC regulation which requires, seemingly without exception, the individualized assessment of all job applicants and employees.  As it is unclear from these opinions

12

whether we considered the inevitable conflict with this regulation that would be generated by our creation of a blanket rule, it is likewise debatable what changes, if any, in the factual or legal underpinnings of <u>Chandler</u> and <u>Daugherty</u>, should affect the viability of this exception. Consequently, without a supervening <u>en banc</u> decision to guide us, we must operate under the assumption that, regardless of intervening changes in the circumstances under which <u>Chandler</u> and <u>Daugherty</u> were decided, an exception to the EEOC regulation requiring individualized assessment is permissible. Thus, we must now determine whether, in the case of drivers with insulin-dependent diabetes, such an exception remains scientifically valid.

### (ii) Viability of a <u>Per Se</u> Rule in the Context of Drivers with Insulin-Dependent Diabetes

In holding that drivers with insulin-dependent diabetes pose a direct threat as a matter of law, we relied, in <u>Chandler</u> and <u>Daugherty</u>, on a generalized safety determination drawn from our review of both DOT regulations and case law. We contemplated a departure from our <u>per se</u> holdings, however, in the event that medical technology should advance to the point that insulin-dependent diabetics no longer pose a danger to themselves or others. Given significant changes in the federal highway safety regulations, as well as purported scientific advancements in the control of diabetes, Kapche argues that the time has now come to reevaluate the <u>Chandler</u>/<u>Daugherty</u> rule. We agree.

13

At the time <u>Chandler</u> and <u>Daugherty</u> were decided, the Federal Motor Carrier Safety Regulations specifically prohibited all insulin-dependent diabetics from obtaining licenses to drive.[15] In <u>Chandler</u>, we noted that these regulations were implemented, at least in part, for the purpose of improving highway safety.[16] Because the Federal Highway Administration had declined numerous opportunities to update or amend these regulations, we inferred that the safety concerns underlying these regulations — including those concerns pertaining to the risks posed by diabetic drivers — remained. In reaching our determination regarding the safety of drivers with diabetes mellitus, we also drew on cases in which other federal courts had held that such individuals present an unacceptable risk when employed in positions that require driving or similarly high risk activities.[17] When taken together, these sources form the foundation on which our holdings in <u>Chandler</u> and

---

[15] 49 C.F.R. § 391.41(a) & (b)(3)(1992).

[16] <u>Chandler</u>, 2 F.3d at 1395 (quoting the preamble to the regulations: "Accident experience in recent years has demonstrated that reduction of the effects of organic and physical disorders, emotional impairments, and other limitations of the good health of drivers are increasingly important factors in accident prevention.").

[17] <u>See</u> <u>Serrapica v. City of New York</u>, 708 F. Supp. 64, 73 (S.D. N.Y 1989)(holding, but not as a matter of law, that the City's disqualification from the position of sanitation truck driver of an insulin-dependent diabetic, who was in poor control of his disease, was not a violation of the Rehabilitation Act); <u>Davis v. Meese</u>, 692 F. Supp. 505, 518 (E.D. Penn. 1988)(holding that the FBI's blanket exclusion of all insulin-dependent diabetics from positions as special agents or investigative specialists was rationally based on valid medical opinion and on health and safety concerns).

14

Daugherty were based.  It appears, however, that in recent years this once solid foundation may have eroded a bit.

In October of 1995, the Department of Transportation amended its highway safety regulations to abolish the prohibition of insulin-dependent diabetics from the operation of noncommercial motor vehicles.[18]  Although nothing in either Chandler or Daugherty indicates that a change in the regulations alone is sufficient to overcome our per se rule,[19] such a change by DOT may very well signal a decrease in the safety risk posed by insulin-dependent diabetics.  In its amicus brief to this court, the American Diabetes Association offers cogent support for this position.  The Association highlights several recent studies and reports which demonstrate that drivers with insulin-dependent diabetes pose no greater danger than do drivers without the disease and the dependency.  In addition, the Association points to technological improvements which have significantly increased the ability of

---

[18]60  F.R.  38,744-45(1995);  49  C.F.R.  §  391.41(a)  & (b)(3)(1995).  With this amendment, individuals having diabetes mellitus are now prohibited only from operating commercial motor vehicles.  Id.  Technically, therefore, under the new law, individuals like Chandler (and Kapche) would face no legal impediment to obtaining a noncommercial drivers license. Daugherty, however, would still be prohibited from operating a bus.

[19]In fact, just months before the effective date of DOT's amendment, we concluded in Daugherty that, even if DOT were to waive its regulations in a particular case, the safety risk posed by insulin-dependent diabetic drivers would remain.  There is nothing in Daugherty to indicate that we perceived any difference in the safety risks posed by commercial versus noncommercial diabetic drivers.

15

diabetics to monitor blood sugar levels and thereby prevent hypoglycemic reactions.

In light of this evidence, we find there to be a genuine dispute of material fact regarding the safety risk posed by insulin-dependent drivers with diabetes mellitus. Consequently, we conclude, the time has come for a reevaluation of the facts that supported our prior per se holdings in Chandler and Daugherty. To this end, we vacate the district court's grant of summary judgment in favor of the City and remand for a determination whether today there exists new or improved technology —— not available at the time these cases were decided —— that could now permit insulin-dependent diabetic drivers in general, and Kapche in particular, to operate a vehicle safely.

Based on our de novo review of the summary judgment evidence, we conclude that the City's physicians did not conduct an individualized assessment of Kapche's present ability to perform safely the essential functions of a police officer. Therefore, if the district court finds a sufficient factual basis for overcoming the per se rule of Chandler/Daugherty, that court should open discovery (or conduct a full blown merits trial) for a determination of Kapche's qualification to perform all of the essential functions of the job.

Also based on our de novo review, we conclude that Kapche has failed to raise a genuine issue of material fact whether the City violated its reasonable accommodation obligation under the ADA.

16

Thus, if the district court should find a sufficient factual basis for concluding that, without accommodation, insulin-dependent diabetic drivers continue to pose a direct threat as a matter of law, the court should reinstate summary judgment in favor of the City.

Consistent with the foregoing instructions, we VACATE and REMAND.

17