## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

## MURRAY, INC. and International Union UAW Local 1621, Defendants.

### No. 1:00–0123.

United States District Court,
M.D. Tennessee,
Nashville Division.

Nov. 13, 2001.

---

Katharine W. Kores, Terry Beck, Celia S. Liner, Equal Employment Opportunity Commission, Memphis, TN, Sally Ramsey, Equal Employment Opportunity Commission, Nashville, TN, for Equal Employment Opportunity Commission, pltfs.

William A. Blue, Jr., Stephen Craig Moore, Constangy, Brooks & Smith, Nashville, TN, for Murray Incorporated.

Lee D. Anderson, Provost, Umphrey Law Firm, LLP, Nashville, TN, for International Union Uaw Local 1621.

### MEMORANDUM

TRAUGER, District Judge.

Pending before the court is the defendant Murray, Inc.'s Motion for Summary Judgment (Docket No. 23), to which the plaintiff has responded (Docket No. 29). For the reasons discussed herein, the defendant's motion will be granted in part and denied in part.

### I. STATEMENT OF FACTS

Since approximately 1968, Raymond "Tommie" Waits has been employed by the defendant Murray, Inc. ("Murray").[1] From at least 1972 until he was laid off on October 17, 1997, Waits operated a powered industrial truck, or forklift, at the defendant's factory in Lawrenceburg, Tennessee. Although Waits cannot recall exactly when he was diagnosed, he claims that he has been an insulin-dependent diabetic for at least the last twenty or twenty-five years. (Docket No. 24, attach. Ex. 1, Deposition of Raymond Tommie Waits at 44)

In 1996 the defendant developed and implemented Lift Truck Operations Medical Screening Parameters, which required employees to answer questions about their medical condition. (Docket No. 24 at 5) All active forklift operators are required to submit to this medical screening every three years. Under Murray's Lift Truck Operations Medical Screening Parameters, individuals are automatically prohibited from operating lift trucks or forklifts under the following conditions: (1) their hearing capabilities in the "best ear" exceed 35db average for 500, 1000, and 2000 Hz test frequencies; (2) they have an established medical history or clinical diagnosis of insulin-dependent diabetes; (3) they are identified as epileptic through established medical history or clinical diagnosis, regardless of whether they are on medication to control the condition; (4) they have a current clinical diagnosis of a

---

1. Unless otherwise noted, the facts have been drawn from the Amended Complaint (Docket No. 18) and the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Docket No. 30).

heart attack, significant chest pain, lack of oxygen or blood supply to the heart muscle, blood clotting conditions, or any other cardiovascular disease known to be accompanied by breathing difficulty, collapsing or fainting spells, or congestive heart failure; (5) or they are currently taking medications that can cause sedation and impair their physical functioning, including but not limited to, antipsychotics, narcotics, spasmolytics, and tranquilizers. (Docket No. 24, attach. Ex. 4, Deposition of James Oliver, attach. Exs. 3, 4)[2]

On or about October 15, 1997, Waits was required to submit to the medical screening. During the screening, Waits reported that he was an insulin-dependent diabetic.[3] As a result, Waits was removed from his position as a forklift operator effective October 17, 1997, and eventually terminated from his employment at Murray. Murray did not require any further medical examinations or inquiries to determine the effect of Waits' diabetes on his ability to operate the forklift safely.[4]

After his termination, Waits filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that he had been removed from his position as a forklift opera-

tor and terminated solely due to his diabetes, in violation of the ADA. On September 29, 2000, the EEOC filed a civil suit against Murray alleging individual discrimination against Waits and a pattern or practice of discrimination through improper medical screening under the ADA. The defendant has moved for summary judgment on all claims.

## II. ANALYSIS

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.,* 886

---

**2.** Murray updated their screening parameters on a yearly basis, and it is somewhat unclear whether these are the guidelines that were in effect in October 1997. (Docket No. 24, attach. Ex. 4, Oliver Dep. at 8–11) Nonetheless, there were no relevant changes to the parameters concerning insulin-dependent diabetes, and these parameters provide a sufficient example of the *per se* exclusions implemented by Murray in 1996.

**3.** There is evidence that Murray had been informed of Waits's condition years before. In the report of a November 9, 1987 vision exam on Waits (required for all forklift operators), the nurse conducting the exam made a note of "Insulin—Diabetes. No limitations." (Docket No. 24, attach. Ex. 6, Deposition of Pat Kent, attach. Ex. 4 at 1)

**4.** Waits actually obtained and submitted a letter from his primary physician, Dr. Clayton Wilson, after his medical screening but prior to his layoff. (Docket No. 24, attach. Ex. 7, Deposition of Sandra J. Calvert at 33–34; *id.,* Calvert Dep., attach. Ex. 2) Dr. Wilson stated that he was "not aware of any serious episodes of low or high [blood] sugar which would cause problems with [Waits's] employment as a lift truck operator." (Docket No. 24, attach. Ex. 7, Calvert Dep., attach. Ex. 2) Both James Oliver, Murray's Health and Safety Director, and Pat Kent, a nurse in the department, stated that such information would not even be considered under Murray's exclusionary policy regarding insulin-dependent diabetes. (Docket No. 24, attach. Ex. 4, Oliver Dep. at 24; *id.,* attach. Ex. 6, Kent Dep. at 46)

F.2d 1472, 1477 (6th Cir.1989). In determining whether the moving party has met its burden, the court must view the factual evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *McLean v. Ontario, Ltd.,* 224 F.3d 797, 800 (6th Cir.2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC,* 219 F.3d 547, 551 (6th Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). If the nonmoving party, however, fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.,* 187 F.3d 533, 537–38 (6th Cir. 1999).

To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *Gaines v. Runyon,* 107 F.3d 1171, 1174–75 (6th Cir.1997). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his favor. *Id.,* at 255, 106 S.Ct. at 2513.

The court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Street,* 886 F.2d at 1479. "There is no genuine issue for trial unless the nonmoving party has produced enough evidence for a jury to be able to return a verdict for that party." *Tinsley v. General Motors Corp.,* 227 F.3d 700, 703 (6th Cir.2000). If the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," or enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson,* 477 U.S. at 249–252, 106 S.Ct. at 2510–12. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White,* 190 F.3d 427, 430 (6th Cir.1999) (citations omitted).

### B. Necessity of Being a Qualified Individual with a Disability

The defendant has moved for summary judgment, in part, on the ground that Waits is not a qualified individual with a disability and, thus, the EEOC is unable to bring a suit under the ADA on behalf of Waits. The EEOC brought this suit alleging that the defendant required periodic medical screenings of all forklift drivers, in violation of 42 U.S.C. § 12112(d)(4)(A). This provision states:

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

The EEOC claims that this provision applies equally to employees who are disabled under the ADA and to employees who are not; thus, whether or not Waits is disabled is irrelevant. The defendant argues that Waits is not entitled to invoke the protections of the ADA unless and

until he can show that he is a qualified individual with a disability; hence, the propriety of the defendant's medical screening procedures cannot be challenged except by an individual who is disabled under the ADA.

As will be discussed, *infra*, the facts of this case do not fall clearly within the scope of section 12112(d)(4)(A). Instead, the EEOC's claims may be analyzed more properly as alleging discriminatory qualification standards under section 12112(b)(6),[5] to which the defendant has raised the defense that the standards are job-related and consistent with business necessity.

Regardless of the basis of the EEOC's claims, however, the EEOC must show that the defendant has discriminated against individuals with disabilities. The statutory language of the enforcement provision of the ADA limits claims to those "alleging discrimination on the basis of disability ...." 42 U.S.C. § 12117(a).[6] "Discrimination" under the ADA is defined in section 12112(a), where it states that "[n]o covered entity shall discriminate *against a qualified individual with a disability because of the disability of such*

individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." (emphasis added). Thus, all claims under the ADA must, at their core, involve allegations of discrimination against individuals with disabilities. As the defendant argues, an individual who is not disabled under the ADA cannot seek the protections of the statute. Unless the EEOC's individual claim on behalf of Waits is brought within that framework, it is not a proper claim under the ADA.[7]

█ The ADA defines a disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of the individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). The parties do not appear to dispute that diabetes is a physical impairment. *See also Kells v. Sinclair Buick—GMC Truck, Inc.*, 210 F.3d 827, 831 (8th Cir.2000) (noting that insulin-dependent diabetes is a "recognized ADA impairment[ ]" and collecting cases). The EEOC concedes that Waits was not

---

**5.** Section 12112(b) provides several definitions or types of discrimination prohibited under subsection (a). Section 12112(b)(6) states that the term "discriminate" includes using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

**6.** The Enforcement provision of the ADA states:

The powers, remedies, and procedures set forth in sections 2000e–4, 2000e–5, 2000e–6, 2000e–8, and 2000e–9 of this title [Title VII enforcement provisions] shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the

Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment. 42 U.S.C. § 12117(a).

**7.** Under the ADA, the EEOC may bring a charge of unlawful employment practice and may file a civil action without a charging individual. *See* 42 U.S.C. § 2000e–5(f) (establishing ability of EEOC to bring a civil action for enforcement of Title); *see also* 42 U.S.C. § 12117(a) (adopting the powers, remedies, and procedures of enforcing Title VII as equally applicable to the ADA). Still, the EEOC is limited by the statutory language of the ADA to bringing only claims "alleging discrimination on the basis of disability ...." 42 U.S.C. § 12117(a).

substantially limited in any major life activity due to his diabetes when he was laid off in October 1997. (Docket No. 30, para. 2) The parties have not addressed whether Waits was disabled under either of the remaining definitions,[8] but the EEOC has made no allegation that Waits had a record of an impairment substantially limiting him in a major life activity or that he was regarded by the defendant as having such an impairment. Because the EEOC has failed to allege and has failed to offer any evidence that Waits was disabled under the ADA, it cannot establish a *prima facie* claim of individual discrimination on his behalf. The defendant is entitled to judgment as a matter of law on this claim.

### C. Pattern or Practice Claim

As a separate argument, the EEOC claims that it is entitled to proceed against Murray regardless of whether Waits is disabled because it "protects the public interest in seeing that violations of federal law are remedied." (Docket No. 29 at 10) The EEOC claims that the defendant's "policy makes disability-based distinctions because it singles out particular medical conditions and medications. Where EEOC can establish liability for a pattern or practice of discrimination, excluded victims with disabilities may be identified later for remedial purposes." *Id.* (citing *United States v. City and Co. of Denver*, 943 F.Supp. 1304, 1309 (D.Colo.1996), *aff'd sub nom. Davoll v. Webb*, 194 F.3d 1116 (10th Cir.1999)).

Although inartfully worded, the EEOC is re-stating its claim that the defendant engaged in a pattern or practice of dis-

criminating against qualified individuals with disabilities. In the Amended Complaint, the EEOC alleges that

> [s]ince at least 1996 ... Defendant Employer has required employees who seek or hold forklift/towmotor positions to submit to medical inquiries and examinations that are not job-related and are not consistent with business necessity
> ....
>
> The effect of the practices complained of ... has been to deprive ... a class of employees of equal employment opportunities, including the opportunity to hold forklift/towmotor positions, and to otherwise adversely affect their statuses as employees because of unlawful medical inquiries and/or examinations.

(Docket No. 18, Amended Complaint, paras. 13–14) The EEOC is alleging a practice of disparate treatment of individuals with certain disabilities, or perceived disabilities. The defendant has not addressed this claim in its motion for summary judgment and has not responded to the EEOC's argument that it may proceed with this claim without specifying individuals who have been discriminated against prior to the remedial phase of the litigation.

As noted, the ADA has incorporated the procedures and remedies available under Title VII. 42 U.S.C. § 12117(a). In *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court established the proper structure for a Title VII pattern or practice case:

---

**8.** The defendant argues that the EEOC has conceded that Waits was not disabled under any definition. (Docket No. 24 at 8) In the initial case management conference in this case, held before Judge Higgins prior to the case being transferred to this judge, the EEOC stated that it was "not contesting the fact that [Waits] may... not be disabled—

under the ADA." (Docket No. 9, Transcript of Proceedings, January 12, 2001, at 4) Further, when the court asked, "There is no issue under your case as to whether he was a qualified individual with a disability?" the EEOC responded, "No, Your Honor." *Id.* at 11.

The plaintiff in a pattern-or-practice suit is the Government, and its initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers. At the initial, 'liability' stage of a pattern-or-practice suit, the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant....

If an employer fails to rebut the inference that arises from the Government's prima facie case, a trial court may then conclude that a violation has occurred and determine the appropriate remedy. Without any further evidence from the Government, a court's finding of a pattern or practice justifies an award of prospective [equitable] relief....

When the Government seeks individual relief for the victims of the discriminatory practice, a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief ... [A]s is typical of Title VII pattern-or-practice suits, the question of individual relief does not arise until it has been proved that the employer has followed an employment policy of unlawful discrimination.

*Id.*, at 360–61, 97 S.Ct. at 1867–68 (internal citations omitted).

In *Davoll v. Webb*, 194 F.3d 1116 (10th Cir.1999), the Tenth Circuit approved the district court's use of the *Teamsters* framework for an ADA pattern-or-practice claim instead of the standard framework for establishing an individual claim of disability discrimination. *See id.* at 1147–48. The district court determined that the United States did not have to prove that the individuals allegedly discriminated against were each qualified individuals with disabilities during the liability phase. *See United States v. City and Co. of Denver*, 943 F.Supp. 1304, 1309 (D.Colo.1996), *aff'd sub nom. Davoll v. Webb*, 194 F.3d 1116 (10th Cir.1999). Instead, in the "remedial phase," the court "determine[d] whether there were any qualified individuals with disabilities who merited relief." *Davoll*, 194 F.3d at 1147.

■ Although the court can find no other Courts of Appeals cases addressing this issue directly, the court is persuaded that the *Teamsters* framework is appropriate for pattern-or-practice claims under the ADA. Hence, the EEOC is not required to prove that any individual job applicants or employees of Murray were qualified individuals with disabilities during the liability phase of the litigation. The EEOC's *prima facie* claim of a pattern or practice of disability discrimination is not dependent on showing that Waits is disabled.[9]

### D. Improper Medical Inquiries under the ADA

The EEOC has alleged a pattern or practice of discrimination based on the defendant's alleged violation of section 12112(d)(4)(A). Section 12112(d)(4)(A) states that medical examinations and inquiries "of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the

---

9. If the EEOC prevails in the liability phase of its claim, it may then seek monetary damages on behalf of qualified individuals with disabilities affected by the discriminatory policy. This would include Waits, if the EEOC could show either that he had a record of a disability or that he was regarded as disabled.

disability" are permitted only if they are "shown to be job-related *and* consistent with business necessity." (emphasis added). An employer may also "make inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B).

In *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804 (6th Cir.1999), *cert. denied*, 530 U.S. 1262, 120 S.Ct. 2718, 147 L.Ed.2d 983 (2000), the Sixth Circuit found that

> an employer's discretion to order employees to undergo examinations is hardly unbounded. Post-hiring demands for examinations can only be made where shown to be 'job-related and consistent with business necessity.' 42 U.S.C. § 12112(d)(4)(A). Thus, for an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job. An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can 'perform job-related functions.' 42 U.S.C. § 12112(d)(4)(B).

Hence, according to the interpretation in Equal Employment Opportunity Commission regulations, any examination ordered by the employer must be restricted to discovering whether the employee can continue to fulfill the essential functions of the job. *See* 29 C.F.R. Part 1630, App. § 1630.14(c) (offering interpretive guidance to § 1630.14(c)). While not controlling authority, this administrative interpretation does represent 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Accordingly, we adopt this qualification for a fitness-for-duty examination, acknowledging it is not an excuse for every wide-ranging assessment of mental or physical debilitation that could conceivably affect the quality of an employee's job performance.

*Id.* at 811–12.

The EEOC argues that because the screening is not prompted by individual employee behavior, it is not permissible under section 12112(d)(4)(A) and is in violation of the ADA. The defendant has offered no evidence that would "cause a reasonable person to inquire as to whether [an individual employee] is still capable of performing his job." There is nothing individualized about Murray's policy or its application. The medical screening serves to preclude individuals who have specific medical conditions or who are taking certain prescription medications from operating forklifts.

Thus, on its face, Murray's medical screening is not permitted under section 12112(d)(4)(A). This finding, however, does not necessarily mean that Murray's policy violates the ADA. Although not presented as such, the defendant's policy seems to fall more properly within the scope of section 12112(b)(6), which states that discrimination prohibited by the ADA includes

> using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

42 U.S.C. § 12112(b)(6). The EEOC Guidelines define "qualifications standards" as "the personal and professional attributes including the skill, experience, education, physical, *medical*, safety and other requirements established by a cov-

ered entity as requirements which an individual must meet in order to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q) (emphasis added).

In this case, the defendant requires all active forklift operators to submit to medical screening every three years. (Docket No. 24, attach. Ex. 6, Deposition of Pat Kent at 23) James Oliver, the defendant's Health and Safety Director since 1978, admitted that forklift operators must undergo medical screening regardless of whether they exhibited any unusual performance or behavior problems. (Docket No. 24, attach. Ex. 4, Deposition of James Oliver at 18) If the screening reveals that a forklift operator has certain medical conditions, he or she is *per se* excluded from continuing in that position.[10] Thus, for example, under the policy, "[i]f [an employee is] a Type I diabetic and require[s] insulin management, [Murray] do[es] no further screening at that point. They're deferred at that point from driving a lift truck." (Docket No. 24, attach. Ex. 6, Deposition of Pat Kent at 20) This exclusion applies to all individuals suffering from Type I, insulin-dependent, diabetes (and other specified conditions) regardless of whether they have suffered any performance problems. *Id.* at 22–23.

Because Murray's screening is not prompted by individual conduct, it does not seem to come within the scope of medical examinations and inquiries covered by section 12112(d)(4)(A). Instead, Murray's requirement that all forklift operators must submit to periodic medical screening and its *per se* exclusion of individuals with certain medical conditions from operating forklifts appears to be the type of generally-applicable qualification standard dis-

cussed in section 12112(b)(6). Although the parties do not present their arguments under the framework of section 12112(b)(6), Murray's medical screening will not violate the ADA if it falls within the scope of this subsection. The parties' arguments on whether the screening is job-related and consistent with business necessity applies equally to both provisions; hence, there is no prejudice to either party in considering the EEOC's claim under this section. *See, e.g. Cripe v. City of San Jose*, 261 F.3d 877, 886 n. 9 (9th Cir.2001) (noting that "[a]lthough the [defendant] [had] mislabeled its argument and identified the wrong standard," the issue was not waived because the facts as presented "put the plaintiffs and the court on notice of the actual issue the defendant should have specified"). Therefore, the court will apply this framework to the EEOC's claim. If Murray can meet its burden of establishing that its medical screening is an acceptable qualification standard that is job-related and consistent with business necessity, *see Andrews v. Ohio*, 104 F.3d 803, 807–08 (6th Cir.1997) (affirming that this is a defense to liability and placing the burden of proof on the defendant), then Murray will be entitled to judgment as a matter of law.

First, the court must determine whether the defendant's medical screening falls within the scope of acceptable "qualification standards, employment tests or other selection criteria" under section 12112(b)(6). "Qualification standards" is the only one of the three terms that is defined in the EEOC's regulations. "Qualification standards" are defined as "the personal and professional attributes including the skill, experience, education,

---

**10.** Although the defendant's policy excludes individuals with several medical conditions from operating forklifts, *see* Statement of Facts, *supra,* the parties focused their arguments on individuals suffering from insulin-dependent diabetes. Thus, the court's analysis is often limited to this medical condition although it applies equally to the other *per se* exclusions in the defendant's policy.

physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q). On its face, the defendant's medical parameters appear to be medical qualification standards.

In fact, however, the EEOC's regulations and courts interpreting this provision have intertwined the definition of a qualification standard with the requirement that it be job-related and consistent with business necessity. Thus, in *Belk v. Southwestern Bell Tel. Co.*, 194 F.3d 946 (8th Cir.1999), the Eighth Circuit held that "[a]n employer urging a business necessity defense [under section 12112(b)(6)] must validate the test or exam in question for job-relatedness to the specific skills and physical requirements of the sought-after position." *Id.* at 951. As the EEOC explained in its interpretive guidance,

> [t]he purpose of this provision [12112(b)(6)] is to ensure that individuals with disabilities are not excluded from job opportunities unless they are actually unable to do the job. It is to ensure that there is a fit between job criteria and an applicant's (or employee's) actual ability to do the job.
>
> Selection criteria that exclude, or tend to exclude, an individual with a disability or a class of individuals with disabilities because of their disability but do not concern an essential function of the job would not be consistent with business necessity.

29 C.F.R. § 1630, App. § 1630.10.

This interpretation also supports the overall purpose of the ADA, which is to "prohibit employers from making adverse employment decisions based on stereotypes and generalizations associated with the individual's disability rather than on the individual's actual characteristics." *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1097 (6th Cir.1998). As the Sixth Circuit has noted, " '[t]he thesis of the [ADA] is simply this: That people with disabilities ought to be judged on the basis of their abilities; they should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies; people ought to be judged on the relevant medical evidence and the abilities they have.' " *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir.1998) (quoting 136 Cong. Rec. § 7422–03, 7347 (daily ed. June 6, 1990) (statement of Sen. Harkin)).

Thus, in order to meet its burden, the defendant must prove that its qualification standards are based on actual ability rather than on general physical or mental impairment and that they are "necessary for the operation of [its] business." *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir.2001). The defendant argues that

> [a] significant job related function of a forklift operator is being able to operate the vehicle safely.... [A]n individual cannot safely operate a forklift if he cannot stay alert and maintain total awareness of his surroundings at all times. Dr. Mills determined that certain medical conditions created a distinct possibility the operator would lose alertness, posing a direct threat to the health and safety of employees in the workplace. Based largely on [Department of Transportation] regulations,[11] Dr. Mills

---

11. The defendant repeatedly asserts that its screening parameters are based, in large measure, on the safety regulations promulgated by the Department of Transportation ("DOT") for commercial motor vehicle operators. *See, e.g.*, (Docket No. 24, attach. Ex. 4, Oliver Dep. at 38–39) However, since 1995, those regulations have *not* prohibited insulin-dependent diabetics from operating *non-commercial motor vehicles* like forklifts. Under the DOT regulations, a person cannot be physically

helped Murray develop medical screening parameters to reduce the risk of that occurrence by screening for, among other things, uncontrolled hypertension, epilepsy, seizures, cardiovascular disorders and diabetes.[12] As individuals with those conditions are more likely than others to suffer lapses of attention, they pose a significant threat to the health and safety of other employees if allowed to operate a fork lift. The medical inquiries conducted by Murray were plainly related to the employees' ability to perform an essential job related function of a forklift operator (i.e., maintaining consciousness and complete alertness at all times operating a forklift) . . . .

(Docket No. 24 at 12)

The EEOC does not appear to dispute that a forklift operator must "stay alert and maintain total awareness of his surroundings" in order to operate the forklift safely. The EEOC does dispute, however, whether the defendant may assume that all insulin-dependent diabetics—or individuals with other specified medical conditions—are incapable of meeting this requirement. Regardless of whether these individuals are at somewhat greater risk of failing this requirement than individuals without these medical conditions, the EEOC argues that the defendant must conduct an individualized inquiry to determine whether a specific employee has difficulty maintaining alertness.

The defendant's policy does appear, on its face, to be based on improper stereotypes and generalizations about individuals with the specified medical conditions. In order to disprove this inference, the defendant must establish that these medical conditions always cause specific physical or mental limitations that prevent the individuals from operating forklifts safely. Otherwise, the defendant is engaging in precisely the type of behavior that the ADA was designed to prevent: making employment decisions based on generalized assumptions about physical and mental impairments without determining the individual capabilities of each employee with the specific impairment.

---

qualified to drive a *commercial motor vehicle* if he or she has an "established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control." 49 C.F.R. § 391.41(b)(3) (2000). A *commercial motor vehicle* is defined, in relevant part, as "any self-propelled or towed motor vehicle used on a highway in interstate commerce to transport passengers or property when the vehicle—(1) Has a gross vehicle weight rating . . . of 4,536kg kilograms (10,001 pounds) or more . . . or (2) Is designed or used to transport more than 8 passengers (including the driver) for compensation; or (3) Is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation . . . ." 49 C.F.R. § 390.5 (2000). Prior to October 1995, the regulations prohibited "all insulin-dependent diabetics from obtaining licenses to drive" both commercial and non-commercial motor vehicles. *Kapche v. City of San Antonio*, 176 F.3d 840, 846 (5th Cir.1999) (citing 49 C.F.R. § 391.41(a) & (b)(3) (1992)). As the Fifth Circuit noted, "such a change by DOT may very well signal a decrease in the safety risk posed by insulin-dependent diabetics." *Id.* at 846–47.

The forklifts used by Murray do not fall within the DOT's definition of a commercial motor vehicle but are non-commercial vehicles which the DOT has found do not require a general prohibition on insulin-dependent drivers. Thus, the defendant cannot rely on these regulations as establishing, as a matter of law, acceptable regulations of its forklift operators. The regulations may be used to support the defendant's arguments, but it must demonstrate that the factual distinctions between forklifts and commercial motor vehicles (*e.g.*, forklifts have a maximum speed of between 7 and 10 miles per hour (Docket No. 24, attach. Ex. 3, at 4)) do not outweigh their persuasiveness.

**12.** The term "uncontrolled" is applied only to hypertension. Under the defendant's policy, all individuals with epilepsy and insulin-dependent diabetes, whether controlled or not, were prohibited from operating forklifts.

In support of its argument that all insulin-dependent diabetics should be precluded from operating forklifts,[13] the defendant relies on "the inherent danger of forklifts coupled with the potential for individuals with certain medical conditions to lose control of these large, heavy, forked, mobile pieces of machinery."[14] (Docket No. 24 at 15) The defendant has offered no evidence, however, of the actual potential for individuals with insulin-dependent diabetes to lose control of forklifts or otherwise suffer from lapses of attention or awareness. Instead, the defendant offers statistics on the general hazards of forklift operation. The defendant claims simply that "an average of 101 persons die each year in accidents involving forklifts. Another 18,000 plus are injured each year, many severely (as shown by 953 amputations resulting from forklift accidents between 1993–1998)." (Docket No. 24 at 15) (citations omitted) Without either sufficient background infor-

mation to put the statistics in proper context or a comparison to other activities, such as driving a car or a commercial motor vehicle, these statistics are wholly insufficient to allow the court to conclude that all insulin-dependent diabetics pose such a substantial risk of attention lapses that the defendant is justified under the ADA in barring them, as a class, from the operation of forklifts.

 Although the defendant is permitted to engage in medical screening under the ADA, it has the burden of establishing that the screening is job-related and consistent with business necessity. *See Monette*, 90 F.3d at 1184. In order to meet that standard, the screening must be designed to isolate individuals who are incapable of performing the essential functions of the position due to physical or mental limitations. Where, as in this case, the defendant screens for specific medical conditions rather than actual physical or

---

**13.** As noted, the defendant does not address the other specified medical conditions in its motion. Thus, the parties arguments are presented in relation to insulin-dependent diabetes.

**14.** Although not presented as such, the defendant appears to be claiming that individuals with insulin-dependent diabetes present a direct threat to the health and safety of others in the workplace, which is a specific qualification standard found in section 12113(b). As the Sixth Circuit has established,

[a] direct threat means that there is 'a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation.' 29 C.F.R. § 1630.2(r). To determine if an individual poses a direct threat, the trial court should evaluate the following factors: '(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm.' 29 C.F.R. § 1630.2(r).

*Hamlin v. Charter Township of Flint*, 165 F.3d 426, 431 (6th Cir.1999). Further, " '[t]he risk

can only be considered when it poses a significant risk, i.e., high probability of substantial harm; a speculative or remote risk is insufficient.' " *Id.* at 432 (quoting 29 C.F.R. § 1630.2(r)).

More directly relevant in this case, "[t]he determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job." 29 C.F.R. § 1630.2(r); *see also EEOC v. Exxon Corp.*, 203 F.3d 871, 873–74 (5th Cir.2000) (differentiating between general qualification standards and the direct threat provision and finding that the business necessity defense applies to the former, i.e., general safety provisions, while the latter requires an individual determination of a specific threat). The direct threat provision is inapplicable in this case because the defendant did not engage in an individualized assessment of employees with the specified medical conditions before removing them from their positions as forklift operators. Instead, the defendant employed a general safety standard, as in *Exxon Corp.*, that must be analyzed under the general defense of business necessity and job-relatedness.

mental abilities, it can only meet this burden by establishing that all individuals with the specified conditions necessarily will have the accompanying physical or mental limitations that prevent them from being able to perform the essential functions of the position. The defendant has not provided sufficient evidence to meet this burden as a matter of law. Whether or not all insulin-dependent diabetics—or individuals with other specified conditions—are incapable of "maintain[ing] consciousness and total awareness of [their] surroundings at all times" such that they are incapable of operating forklifts safely is a question for the trier of fact.

### E. OSHA Requirements

As a separate defense to the EEOC's allegations, the defendant claims that its regulations are required under the General Duty Clause of the Occupational Safety and Health Act ("OSHA"), 29 U.S.C. § 654(a)(1). The EEOC regulations provide that "[i]t may be a defense to a charge of discrimination under this part that a challenged action is required or necessitated by another Federal law or regulation, or that another Federal law or regulation prohibits an action ... that would otherwise be required by this part." 29 C.F.R. § 1630.15(e). The admittedly few courts that have considered this provision have accepted it as a complete defense to an ADA claim, as long as the defendant could show that the action was, in fact, required by another Federal law. *See, e.g., Bower v. Federal Express Corp.,* 156 F.Supp.2d 678, 686 (W.D.Tenn.2001); *Thoms v. ABF Freight Sys., Inc.,* 31 F.Supp.2d 1119, 1124 (E.D.Wis.1998); *Campbell v. Federal Express Corp.,* 918 F.Supp. 912, 917 (D.Md.1996).

The General Duty Clause of OSHA provides for the duties of employees and employers and states that each employer "shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1). The defendant argues that it

> recognized the operation of forklifts in this particular plant by persons with specific medical conditions, such as insulin-dependent diabetes, posed a hazard likely to cause death or serious physical harm to its employees. Murray was thus required by OSHA's General Duty Clause to take affirmative steps to eradicate the hazard and protect its employees. The only way successfully to eradicate this recognized hazard was to conduct medical inquiries of all current and potential forklift operators to determine if they had the hazard-posing conditions.

(Docket No. 24 at 13)

The EEOC claims that the General Duty Clause does not require the defendant to preclude all individuals suffering from specific impairments from operating forklifts. The EEOC asserts that the ADA simply prevents an employer from relying on generalizations in fulfilling its obligations under the General Duty Clause. Thus, for example, an insulin-dependent diabetic who is determined to suffer from frequent blackouts due to uncontrolled blood sugar may be precluded from operating a forklift because it would pose a hazard in the workplace, but employees may not be precluded solely on the basis of their medical conditions without any individualized assessment of the specific risk posed by their operation of a forklift.

■ The EEOC's argument is well-taken. Again, in order to rely on a *per se* exclusion of all individuals with certain medical conditions, the defendant must show that the condition necessarily results in a specific limitation that would preclude

all individuals with the condition from being able to operate a forklift safely. Otherwise, the General Duty Clause does not require the defendant to exclude these individuals from operating forklifts and fails as a defense to a claim of disability discrimination. The defendant has not met that burden on the evidence submitted to the court, and it is not entitled to judgment as a matter of law.

### III. CONCLUSION

For the reasons discussed herein, the defendant's motion for summary judgment on the individual claim on behalf of Raymond Waits will be granted. The defendant's motion for summary judgment on the EEOC's claim of a pattern or practice of discrimination in violation of the ADA will be denied.

An appropriate Order shall Enter.

### ORDER

Pending before the court is the defendant Murray, Inc.'s Motion for Summary Judgment (Docket No. 23). For the reasons discussed in the accompanying Memorandum, the defendant's motion is **GRANTED** as to the individual claim on behalf of Tommie Waits and **DENIED** as to the EEOC's claim of a pattern or practice of discrimination.

It is so Ordered.