

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-14-2007

# Ward v. Merck Co Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-1270

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Ward v. Merck Co Inc" (2007). *2007 Decisions.* Paper 1479.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1479

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

NO.  06-1270
_____

GARY WARD,
Appellant

v.

MERCK & COMPANY, INC.
_____

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 04-cv-5996)
District Judge:  Honorable R. Barclay Surrick
_____

Submitted Under Third Circuit LAR 34.1(a)
February 16, 2007

Before: SMITH and FISHER, *Circuit Judges* and
DOWD, *District Judge*.[*]

(Filed:  March 14, 2007)
_____

OPINION
_____


DOWD, *District Judge*.

_____

   [*]Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

# I.  Introduction

Gary Ward, a former employee of Merck & Company ("Merck"), characterized his termination by Merck as a violation of the Americans With Disabilities Act and sought compensatory and punitive damages, along with reinstatement to his former position as a chemist with Merck.  Following extensive discovery,  Merck's motion for summary judgment  was granted.  This appeal followed.  We find no error and we will affirm.

# II.  The Factual Setting

Ward was hired by Merck as a staff chemist in 1996.  Ward took a required pre-placement physical examination and, as a result, was determined to be able to perform "any job without restriction."  Ward received a promotion to a Grade 7 Research Biochemist in January of 2001.  On November 6, 2002, Ward tendered his resignation from Merck, citing stress from perceived problems at work.[1]  At Merck's request, he

---

[1]Ward's appellate brief describes the background for the resignation as follows:

> On October 23, 2002, after experiencing trouble sleeping for about a week because of "problems at work," Mr. Ward visited the emergency room at Doylestown Hospital R.R. A-73 to A-87.  He presented with complaints of "high amounts of stress in his job and anxiety" R.R. A-78.  Mr. Ward further reported "that his computer [at work was] being monitored and that he [was] being harassed." *Id*.  Plaintiff was diagnosed with an anxiety disorder, and ultimately advised to seek out-patient treatment for that condition. *Id*.
> On or about October 29, 2002, plaintiff visited Jonathan Beck, D.C., his primary care physician, and complained of "feeling anxious, and tense" over the past three weeks in relation to an "incident at work," on which he "didn't want to elucidate" R.R. A-89.  Dr. Beck diagnosed plaintiff with an

withdrew his resignation two weeks later on November 20, 2002.

Beginning in February 2003, Ward began to engage in strange behavior that started with an episode in Merck's cafeteria on February 19th.[2] Based on this episode, Ward was off work until March 17, 2003. He returned to work with an initially restricted schedule of three days a week until March 31, 2003, when he was permitted to return to full-time employment.

_____

> anxiety disorder and prescribed medication. Merck's medical file does not contain any information regarding either the Doylestown Hospital visit nor treatment by Dr. Beck. R.R. A-274 to A-323. There is no evidence that any of the relevant decision-makers were ever aware of this treatment. R.R. A-237 to A-240.[1]
>
> > [1]Judge Surrick found as a fact that this information did not inform the decision to require Mr. Ward to undergo a medical examination. R.R. A-19.

Appellant's Br. at 4-5 (footnote in original).

[2]Ward's appellate brief describes the event as follows:

> On February 19, 2003, Mr. Ward had an episode at work in the cafeteria, after which he was taken to Central Montgomery Medical Center (Lansdale Hospital) for evaluation and released. R.R. A-893 to A-894; A-910 to A-911. At CMMC, plaintiff was diagnosed with schizophrenia. R.R. A-910 to A-911; A-192. After he was released, he was treated by Dr. Esther Kamisar, a psychologist, and Dr. Josephine Pobre-So, a psychiatrist. R.R. A-916. Dr. Kamisar diagnosed plaintiff as having suffered from a brief psychotic disorder the previous day, and generally suffering from anxiety disorder. *Id*. She advised that he see a psychiatrist. *Id*. He treated with Dr. Pobre-So, who made a final diagnosis of Panic Disorder without Agoraphobia. R.R. A-110. He was released with a prescription for Paxil. *Id.*

Appellant's Br. at 6.

Upon his return to work, Ward's behavior and work performance were reported to have deteriorated. His supervisors became concerned for both Ward and his co-workers. Based on employee observations of Ward and a review of his conduct by Dr. Peter Nigro with Merck's Health Services, Ward was requested by e-mail on June 23, 2003, to make an appointment with Dr. Nigro for an evaluation. Ward's attempts to make an appointment apparently met with failure.

Ward had been supervised in a lab run by Dr. Stevenson who, in turn, was supervised by Dr. Michael Washabaugh. Following Ward's failure to make the requested appointment with Dr. Nigro, Dr. Washabaugh met with Ward on July 3, 2003, and emphasized the need to undergo the examination. Dr. Washabaugh advised Ward that the appointment was mandatory. Ward continued to reject the directive to take the evaluation. On July 7, 2003, Ward was given a letter which advised he was "being suspended from work with pay, effective immediately."

During the suspension period, Ward had no contact with any Merck employees. On July 25, 2003, Ward was advised that his employment was terminated immediately, but he was also provided a final opportunity to reconsider his refusal to comply and to schedule an evaluation within the next two days. Ward did not respond.

### III. Proceedings Below

A. **Ward's Complaint and Merck's Answer**

Ward's complaint and Merck's answer set the stage for extensive discovery that preceded the summary judgment stage of the case. The three-count complaint alleged

violations by Merck under Title I of the Americans with Disabilities Act ("ADA") and the Family and Medical Leave Act ("FMLA"). It alleged that Ward was regarded as disabled by Merck and/or had a record of disability and that Merck terminated Ward's employment as a result of his disability, without any effort at accommodation. Specifically, paragraph 20 of the complaint alleged that, on or about June 26, 2003, Merck demanded that Ward undergo a psychiatric examination unrelated to any legitimate work requirement and demanded that the psychiatric examination be conducted by its in-house medical department.[3] Continuing, paragraph 24 of the complaint alleged that Ward was terminated for refusing to submit to the unlawful psychiatric examination that Merck had directed him to undergo.[4]

_____

[3]Merck responded in its answer and asserted the following:

> As to paragraph 20, Merck states that plaintiff's peers and supervisors had observed him engage in unusual and disruptive behavior and Merck's Employee Health Services Medical Director had recommended that plaintiff be medically evaluated in order to determine his health and fitness to perform his job duties. On June 26, 2003, Merck requested plaintiff to make an appointment with its Employee Health Services Director for a "fitness-for-duty" evaluation at his earliest opportunity....

[4]Merck admitted that, on July 7, 2003, plaintiff was suspended from work, with pay, based on his refusal to follow his Senior Director's directive that he submit to a fitness-for-duty evaluation by a physician from Merck's Employee Health Services Group and further alleged in its answer as to paragraph 24:

> . . . that on about July 24, 2003, Merck sent plaintiff a letter notifying him that his employment with Merck was terminated, effective immediately, for his refusal to comply with the directive that he submit to a medical evaluation. Merck states further that its letter gave plaintiff 48 hours to reconsider his refusal to comply with the directive by contacting his

5

**B.** **The District Court's Ruling Granting Summary Judgment**

Before addressing the fitness-for-duty issue, the district court observed that it found no evidence that Ward was subjected to a hostile work environment; no evidence that Ward was compelled by Merck to take a leave of absence; and that Ward had abandoned a portion of his claim in Count III of his complaint alleging that Merck violated the FMLA by compelling him to take leave and requiring him to submit to a fitness-for-duty evaluation.

Next, the district court addressed the subject of when an employer may seek a "fitness-for-duty certification" with regard to a particular health condition that caused the employee's need for FMLA leave and opined:

> Under certain circumstances, an employer may subsequently request re-certification of an employee's medical condition, for example where '[c]ircumstances described by the previous certification have changed significantly'... 'No second or third opinion on re-certification may be required.'" (regulatory citations omitted).

The district court rejected Ward's argument that Merck's request for Ward to undergo a fitness-for-duty evaluation constituted a "second opinion" under the FMLA because there is no second opinion when there has been no re-certification and Ward's leave of absence had ended months before Merck requested that Ward undergo the challenged examination.

---

business unit's Human Resources Director and scheduling an appointment with one of the physicians in Employee Health Services no later than Monday, July 28, 2003. Merck states further that plaintiff failed to take any action in response to Merck's letter....

The district court addressed Ward's claims of a prohibited medical inquiry and retaliation in violation of the ADA in the context of 42 U.S.C. § 12112 (d)(4), which provides in pertinent part:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, *unless such examination or inquiry is shown to be job-related and consistent with business necessity.* (emphasis added).

The district court, after a review of the testimony placed in the record in support of Merck's motion for summary judgment, declared that there was "more than sufficient evidence to justify Defendant's medical inquiry" and indicated that it was compelled to conclude that the medical inquiry requested of Plaintiff was "consistent with business necessity" as required by § 12112(d)(4).

Continuing, the district court then ruled that Ward's retaliation claim must, of necessity, fail as there was no violation of the ADA in requiring the plaintiff to submit to a "fitness-for-duty" evaluation.

## IV. Issues and Arguments on Appeal

### A. The Four Issues Advanced by Ward on Appeal [5]

Ward advances three issues which he then suggests should be answered in the affirmative.

---

[5]The first of the four issues raised was limited to the district court's ruling on a motion in limine, which will be addressed later.

Issue Number 2: Did the ADA prohibit an employer from requiring an employee to undergo a post-employment medical examination where the employer has no reasonable belief that any physical or mental health condition was interfering with the employee's ability to perform the essential duties of his position?

The premise of Issue Number 2 is that Merck, the employer, lacked a reasonable belief that Ward had any physical or mental health condition that was interfering with his ability to do his job as a chemist.

Issue Number 3: Did the district court commit reversible error in concluding that a claim of retaliation under the ADA is not viable unless the claim is premised on opposition to employer actions that are actually unlawful under the ADA?

The premise for this issue is that, even if Merck had a valid basis for requesting the fitness-for-duty examination, Ward is able to maintain a separate claim based on Merck's decision to terminate Ward's employment as a form of retaliation for refusal to take the fitness-for-duty examination.

Issue Number 4: Does the FMLA prohibit an employer from requiring an employee to undergo a medical examination where the employer has no reasonable belief that an employee's ongoing limitations may interfere with his ability to work?

In support of Issues Number 2 and Number 4, Ward cites to selected portions of the deposition testimony of Merck's employees, and contends, at a minimum, the cited testimony undercuts the district court's grant of summary judgment.

Specifically, Ward alleges or points to the following:

8

(1) The deposition testimony of Dr. Cohen that Ward continued to perform the duties of his position. (R.R. A-501)[6]

(2) Michael Washabaugh gave testimony to the effect that there was no consideration given to requiring Ward to undergo a fitness-for-duty examination when he returned to work from his medical leave in February. (R.R. A-411 to A-412)

(3) According to Merck's employee, Kathy Korsen, Dr. Washabaugh did not believe that any physical or mental condition was potentially restricting Ward in the functions of his job. (R.R. A-584)[7]

---

[6]The specific testimony, at A-501, follows:

Q. How was his work doing?
    * * *
        THE WITNESS: Very, very -- you know, just barely doing what he needed to do. I mean he was still doing experimental work, you know. I found it quite amazing actually that somebody could still be performing, you know, mechanically but be so incredibly disengaged.

[7]The testimony of Kathy Korsen, upon which Ward makes the claim, follows:

Q. What did you do with that information?

A. I counseled Mike to have some discussions with him -- with Gary to talk about these issues.

Q. Okay. And what happened next?

A. And so Mike had discussions with Gary, ongoing discussions and the situation didn't improve.

Q. Okay.

A. So he came to see me again and we talked about putting Gary on a performance improvement plan. But Mike was concerned because he didn't want to put Gary on a performance improvement plan if the behavioral issues were something different. And so that's where we decided to

(4)  Dr. Nigro did not believe that the information supplied sufficiently documented the need for a fitness-for-duty examination.  (R.R. A-590)[8]

———————————

> consult with Dr. Nigro.
>
> Q.  Did Dr. Washabaugh share with you at all that he had concerns about Mr. Ward's physical abilities to do the job?
>
> A.  Not his physical abilities.
>
> Q.  Did Dr. Washabaugh share with you at all that he felt that Mr. Ward was mentally incapable of doing his job?
>
> A.  No.  He shared with me that his -- so if you would consider behavioral to come under mental, yes.  But he just gave me specific examples of behavior that he thought was impeding his able [sic] to perform at the level expected of him.
>
> Q.  What did you do?  Or what did you advise?
>
> A.  So we talked about putting Gary on a performance improvement plan. . . .

(A-583 to A-584).

[8]The source of the claim is the testimony of Kathy Korsen as follows:

> Q.  Okay.  After either you or Dr. Washabaugh forwarded information to Dr. Nigro, what happened next?
>
> A.  So after Dr. Nigro looked at the information he said this really doesn't tell me what I need to know.  My suggestion is that you spend sometime [sic] talking to Gary myself and finding out what's going on.
>
> Q.  And I understand then a request was made that Mr. Ward make an appointment to see Dr. Nigro?
>
> A.  Yes.

(A-590).

(5) Dr. Washabaugh directed Ward to submit to a fitness-for-duty examination, but did not inform Ward that performance deficiencies were placing his job at risk at the time he requested Ward to undergo the examination. (R.R. A-420)

(6) Furthermore, Dr. Washabaugh did not believe Ward was either physically or mentally restricted in performing his job. (R.R. A-421 to A-422)[9]

---

[9]*See* Testimony of Dr. Washabaugh, as follows:

Q. Okay. What duties of his job were you concerned that Gary was not mentally capable of doing?

A. My observation was that Gary was not doing his job.

Q. Okay. Well, did you have a concern that -- I'm sorry. Go ahead.

A. I continued asking him for explanations. We approached the low performance, tried to engage him in discussions about what was concerning him or what was causing him to underperform. We had zero response.

Q. Okay.

A. So that it wasn't my place to judge whether it was physical or mental capability. It was just an incapability. He wasn't doing it. So, I didn't know whether it was willingness or capability. Something was not engaged.

Q. Did you have any belief that Mr. Ward was mentally incapable of doing his job?

A. No. It was clearly this decision part of was it capability, willingness, or both. I had no idea. Because I didn't know whether we should go on a PIP, Performance Improvement Plan, or explore this capability or willingness issue, and that's where the Health Services consultation part was to help us understand capability and willingness. We were trying to

11

(7)  There were never any complaints that Ward engaged in any threatening behavior.  (R.R. A-532 to A-533)[10]

_____

help.

(A-421 to A-422).

[10]The reference is to testimony of Merck's employee, Dr. Steven Cohen, and his testimony follows:

Q.    Did Ms. Hampton ever express any concerns to you?

A.    She might have, yeah.

Q.    Does anything spring to mind in particular?

A.    And I would say most of the time the conversation was, you know, Gary is -- Gary frightens me.  He's walking around like he's a zombie.  I see him walking back and forth and this or that or the other thing.  I mean that's the -- you know, independently of my observations it confirmed what I was seeing.

Q.    Other than what occurred in February in the cafeteria, were you aware of Gary doing anything that was actually threatening to someone, I mean overtly threatening?

A.    Not that I am aware of.

Q.    Did you ever hear of anybody complaining that Gary had in any way threatened them or engaged in some sort of overtly aggressive behavior toward them?

A.    No.

Q.    Would you say that Gary ever engaged in overtly aggressive behavior toward you?

A.    No.  I mean what do you mean by aggressive?

Q.    Well I was going to -- if you had said yes I was going to ask

12

(8) Dr. Cohen did not have any input into the decision to require Ward to undergo a fitness for duty examination. (R.R. A-538)

## B. Merck's Appellate Response

### 1. The job-relatedness of the required fitness-for-duty evaluation was not an issue before the district court

Merck points to the fact that Ward made no such argument in his response to

Merck's motion for summary judgment or in his motion for partial summary judgment,

citing A-0679-91[11] and A-0720-47. Additionally, Merck disputes the citations to the

you what you meant but --

A. I mean here in Montreal he had a temper tantrum. And from Gary that's -- on his scale that was aggressive.

Q. What do you mean by his scale?

A. Gary is a quiet, reserved person and never did that.

Q. What do you mean by a temper tantrum? I kind of picture a young child pounding his fists on the floor.

A. He wasn't pounding but he turned red. He was sort of beating his hands.

Q. Did you interpret that as a threatening gesture to you or just an odd behavior?

A. Mainly an odd behavior.

(A-532 to A-534).

[11]In Ward's opposition to Merck's motion for summary judgment, his first footnote stated:

Plaintiff does not contend that he suffered from any actual disability,

record by Ward in support of his argument that the order to take a fitness-for-duty test was not job related.

### 2. The ADA does not demand that an employer exhaust disciplinary options prior to requiring a fitness-for-duty evaluation

Title 42, United States Code, § 12112 (d)(4)(A) only requires that a medical evaluation (fitness-for-duty) examination be job related and consistent with business necessity. The evidence advanced by Merck indicated that Ward was aware that his supervisors had concerns about his workplace behavior and performance prior to Merck's order that Ward submit to a fitness-for-duty evaluation.

### 3. The observations of Ward's workplace behavior and performance were sufficient to cause a reasonable person to doubt plaintiff's ability to perform his job and supported Merck's decision to require Ward to submit to a fitness-for-duty evaluation

The record evidence of the information supplied to Merck in support of its decision to require Ward to submit to a fitness-for-duty evaluation is undisputed. That evidence included:

(1) Ward's level of performance was at the absolute minimum[12]

---

nor that Defendant regarded him as being impaired. To the contrary, Plaintiff's supervisors have testified that they did not regard him as impaired. Plaintiff is therefore proceeding under ¶¶ 23-24 of his Complaint, alleging that he was suspended and later terminated for refusing to undergo an illegal examination.

(A-679).

[12]The materials submitted in support of Merck's motion for summary judgment included the June 23, 2003 report of Michael Washabaugh to Peter Nigro responding to

(2) Ward's "productivity has dropped to near zero--he is not performing or communicating at even a minimal level" [13]

(3) Ward "is not participating as a member of the lab or greater group"[14]

(4) Ward "seems to be resistant to advice, counseling, mentoring, or guidance - any and all forms of interaction" [15]

(5) Ward is easy to anger, even during casual conversation, and "his current behavior is disturbing and uncomfortable to be around" [16]

(6) "A face-to face conversation with Ward is now practically impossible; he will not initiate the conversation, even it is 'expected' of him" [17]

(7) Ward "will talk only if asked and most of the time his comments will be terse and repetitive (like 'right' and 'yes') inappropriate to the situation and leaving you with the clear feeling that no connection was made" [18]

(8) Ward "appears deliberately slow, almost catatonic...this behavior

---

an inquiry about Ward's performance. *See* A-138.

[13]*See* A-138.

[14]*See* A-138.

[15]*See* A-138.

[16]Merck employees Lorie Keller and Joye Minisci wrote an extensive memo to Dr. Washabaugh on June 17, 2003 concerning Gary Ward's conduct after returning from medical disability and concluded with the statement: "Clearly Gary is not the same person he used to be. His current behavior is disturbing and uncomfortable to be around." *See* A-137.

[17]Steven Cohen, a Merck employee, wrote a memorandum to Dr. Washabaugh dated June 17, 2003, regarding his observations of Ward. *See* A-136.

[18]*See* A-136.

borders on frightening" [19]

**4. Merck did not make "dispositive admissions" (as claimed by Ward in his appellate brief) that disputed the business necessity requiring Ward to submit to a fitness-for-duty evaluation**

**a. Did Dr. Washabaugh, as claimed by Ward (citing A-584), admit that he did not believe that any physical or mental condition was potentially restricting Ward in the functions of his job?**

We find that the citation to the appendix is to the deposition of Merck employee, K. Korsen. The short answer is no.

**b. Did Dr. Cohen, as claimed by Ward (citing A-501), acknowledge that Ward continued to perform the duties of his position?**

During his deposition Dr. Cohen testified at length as to Ward's poor performance and his strange behavior, which Cohen described as catatonic in a general sense (A-500). Ward relies on the following exchange:

> Q: How was his work doing?
>
> * * *
>
> A: Very, very - you know, just barely doing what he needed to do. I mean he was still doing experimental work, you know. I found it quite amazing actually that somebody could still be performing, you know, mechanically, but so incredibly disengaged.
>
> Q: Was he still - was he still - was his output still at the same level as it had been all along?
>
> A: At the very bottom of that - you know, if I were

_____

[19]*See* A-136.

16

to draw a scale it was just absolute minimal,
yeah.

(A-501-502). Cohen's deposition continued with examples of the poor and undependable employment performance of Ward in his role as a chemist.

Ward's claim that he continued to perform his duties in a manner that preempted Merck's demand that he take the fitness-for-duty evaluation ignores the reality of the nature of the complaints about not only Ward's work performance, but also his strange behavior among his fellow employees. The record is undisputed that Merck's supervisory employees had a concern about the safety of their other employees, given the unusual behavior of Ward, and this perceived safety concern was, standing alone, sufficient to establish the "business necessity" element of the ADA's standard for post-employment medical examinations. *See Conroy v. New York State Dept. of Correctional Services,* 333 F.3d 88, 98 (2d Cir. 2003)[20] (endorsing, *Cripe v. City of San Jose*, 261 F.3d

---

[20]*Conroy* stated:

> The case law on inquiries directed towards individual employees thus demonstrates that courts will readily find a business necessity if an employer can demonstrate that a medical examination or inquiry is necessary to determine 1) whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties (such as frequent absences or a known disability that had previously affected the employee's work) or 2) whether an employee's absence or request for an absence is due to legitimate medical reasons, when the employer has reason to suspect abuse of an attendance policy. These two business necessity justifications are merely illustrative, and an employer may be able to demonstrate other business necessities. . . .

17

877, 890 (9th Cir. 2001)).

    **c.**    **As claimed by Ward (citing A-421-422), Dr. Washabaugh did not believe that Ward was either physically or mentally restricted in performing his job when Ward was directed to take the fitness-for-duty test.**

The testimony of Dr. Washabaugh at the cited pages follows:

Q.    Was physically an issue in your mind at all?

A.    No.

Q.    Okay. What duties of his job were you concerned that Gary was not mentally capable of doing?

A.    My observation was that Gary was not doing his job.

Q.    Okay. Well, did you have a concern that - I'm sorry. Go ahead.

A.    I continued asking him for explanations. We approached the low performance, tried to engage him in discussions about what was concerning him or what was causing him to underperform. We had zero response.

Q.    Okay.

A.    So it wasn't my place to *judge whether it was physical or mental capacity.* It was just incapability. He wasn't doing it. So I didn't know whether it was willingness or capability. Something was not engaged. (emphasis added)

Q.    Did you have any belief that Mr. Ward was

---

333 F.3d at 98.

18

mentally incapable of doing his job?

> A.      No.  It was clearly this decision part of was fit
>         capability, willingness or both ...

We find the claim advanced by Ward as to belief of Dr. Washabaugh unsupported by the record.

In sum, we reject the claim that the alleged deposition admissions by Merck witnesses disputed the "business necessity" for the fitness-for-duty evaluation.

## V.  Discussion

### A.      The Applicable Case Law

The standard of review in an appeal from an order resolving cross-motions for summary judgment is plenary or *de novo*.  *Gordon v. Lewistown Hospital*, 423 F.3d 184, 207 (3d Cir. 2005).  The issue on appellate review is whether, pursuant to Fed. R. Civ. P. 56(c), there is a genuine issue of any material fact that defeats the moving party's motion for summary judgment.  The immediate focus in this case is whether there remains an issue as to a material fact on Merck's claim of a business necessity for its demand that Ward submit to a fitness-for-duty evaluation.  Against that background, it is beyond dispute that the ADA allows an employer to require medical examinations of its employees when "such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 1211 (d)(4)(A).

*Conroy* teaches that, for the employer to justify the fitness-for-duty evaluation, it "must show that the asserted 'business necessity' is vital to business.  For example,

19

business necessities may include ensuring that the workplace is safe and secure or cutting down on egregious absenteeism." 333 F.3d at 98.

The district court found more than sufficient evidence to justify Merck's medical inquiry. The appellate issue is whether, after a *de novo* study applying Fed. R. Civ. P. 56(c), and reviewing the submissions in support and in opposition to the competing motions, there is a genuine issue of material fact on the issue of a business necessity to require the medical examination.

In an attempt to establish a genuine issue as to Merck's claim of a business necessity, Ward has directed this court's attention to selected portions of the deposition testimony of Merck's employees, Cohen, Washabaugh, Nigro and Korson.

We have already addressed and rejected Ward's proposition that the deposition testimony established a genuine and material issue requiring a jury trial as to Merck's claim of a business necessity.

## B.     The Court's Ruling

Merck had the burden of going forward in support of its claim of a business necessity for the fitness-for-duty test of Ward. We find, as did the district court, that Merck met its burden. Ward failed to produce any competent evidence disputing Merck's claim that, under the provisions of 42 U.S.C. § 12112 (d)(4), it had a business necessity justifying the fitness-for-duty evaluation. Ward's additional claim that he has a stand-alone cause of retaliation based on his refusal to take the fitness-for-duty test is totally devoid of merit.

## VI.  The Challenged Grant of the *In Limine* Motion
## Regarding Ward's Treatment During his FMLA Leave

The district court, apparently in the belief that a reviewing court might reverse the grant of summary judgment, also issued a ruling on Ward's claim that he was entitled to the granting of his motion *in limine* that was designed to prohibit Merck from introducing at trial testimony with respect to Ward's treatment while he was on an earlier sick leave.  Given our ruling on summary judgment, it is unlikely that there will be a trial. However, after examining the district court's ruling on Ward's *in limine* motion, we are of the view that his ruling, an evidentiary ruling, was correct.

## VII.  Conclusion

The judgment of the district court will be AFFIRMED.